Slip Op. 00 - 85

UNITED STATES COURT OF INTERNATIONAL TRADE

```
- - - - - - - - - - - - - - - - - - - - - - -x
TURTLE ISLAND RESTORATION NETWORK, A    :
CALIFORNIA NONPROFIT CORPORATION; TODD
STEINER; THE AMERICAN SOCIETY FOR THE   :
PREVENTION OF CRUELTY TO ANIMALS, A NEW
YORK NONPROFIT CORPORATION; THE HUMANE  :
SOCIETY OF THE UNITED STATES, A DELAWARE
NONPROFIT CORPORATION; and THE SIERRA   :
CLUB, A CALIFORNIA NONPROFIT CORPORATION,
                                        :
                Plaintiffs,
                                        :
              v.                             Court No. 98-09-02818
                                        :
ROBERT L. MALLETT, ACTING SECRETARY OF
COMMERCE; MADELEINE ALBRIGHT, SECRETARY :
OF STATE; LAWRENCE H. SUMMERS, SECRETARY
OF TREASURY; DAVID B. SANDALOW, ASSIST-  :
ANT SECRETARY OF STATE FOR THE BUREAU OF
OCEANS AND INTERNATIONAL ENVIRONMENTAL  :
AND SCIENTIFIC AFFAIRS; PENELOPE D. DAL-
TON, ASSISTANT ADMINISTRATOR FOR FISHER- :
IES, NATIONAL MARINE FISHERIES SERVICE;
and ALAN P. LARSON, UNDER SECRETARY OF   :
STATE FOR ECONOMIC, BUSINESS AND AGRI-
CULTURAL AFFAIRS,                         :

                Defendants,    :

              -and-                     :

NATIONAL FISHERIES INSTITUTE, INC.,     :

                Intervenor-Defendant.    :
- - - - - - - - - - - - - - - - - - - - - - -x
```

<u>Opinion</u>

[Upon entry of final judgment, plaintiffs' appli-
 cation for award of attorneys' fees denied.]

Dated:  July 19, 2000

    Legal Strategies Group (Joshua R. Floum) for the plaintiffs.

    David W. Ogden, Acting Assistant Attorney General, and Lois
J. Schiffer, Assistant Attorney General; David M. Cohen, Director,
Commercial Litigation Branch, Civil Division (Lucius B. Lau)
and Environment and Natural Resources Division, Wildlife and Ma-rine
Resources Section (Jean E. Williams and Jane P. Davenport), U.S.
Department of Justice; and Jay S. Johnson, Deputy General Counsel,
National Oceanic and Atmospheric Administration, U.S. Department of
Commerce; and Office of the Legal Advisor, U.S. Department of State
(Violanda Botet), of counsel, for the de-fendants.

    Garvey, Schubert & Barer (Eldon V.C. Greenberg) for the in-
tervenor-defendant.


    AQUILINO, Judge:  The plaintiffs request that the court

enter final judgment in conformity with its slip op. 99-32, filed

herein sub nom. Earth Island Institute v. Daley[1], and which here- by

is incorporated by reference in this opinion.  The plaintiffs also

have interposed an application for award of attorneys' fees, costs

and expenses pursuant to the Equal Access to Justice Act ("EAJA"), 28

U.S.C. §2412.

    The defendants and intervenor-defendant do not oppose

entry of judgment, but the government does object to any award of

fees etc.

---

[1] 23 CIT __, 48 F.Supp.2d 1064 (1999).  Pursuant to formal motion, Turtle Island Restoration
Network has supplanted Earth Island Institute as the first named plaintiff [cf. Declaration of Todd
Steiner in Support of Plaintiffs' Application for Attorneys' Fees, Costs and Expenses, para. 3 (May 2,
2000)], while the names of the individuals currently occupying the U.S. government of-fices impleaded
as defendants have been substituted in the above caption of this case in accordance with CIT Rule
25(d).

I

As discussed hereinafter, an application made pursuant to EAJA requires the court to revisit the merits of the underly- ing case. Here, the primary object of plaintiffs' Complaint for Declara- tory Judgment, Review of Agency Action, Mandamus and In- junctive Relief has been the Department of State's <u>Revised No- tice of Guide- lines for Determining Comparability of Foreign Pro- grams for the Protection of Sea Turtles in Shrimp Trawl Fishing Operations</u>[2], which announced that the Department was reinstating

> its determination that the harvesting of shrimp with TEDs
> does not adversely affect sea turtle species  and that
> TED-caught shrimp is therefore not subject  to the import
> prohibition created by Section 609(b)- (1).  . . .
> [H]owever, the Department . . . has de-cided to establish
> several conditions and incentives relating to the importa-
> tion of such shrimp that are intended to address concerns
> that have been raised about the effect of this determina-
> tion on the conser-vation of sea turtle species.[3]

---

[2] 63 Fed.Reg. 46,094 (Aug. 28, 1998)[referred to hereinafter as "1998 Revised Guidelines"].  As outlined in slip op. 99-32, those guidelines issued in the aftermath of a report of a panel of the Dispute Settlement Body ("DSB") of the World Trade Organ-ization ("WTO") <u>sub</u> <u>nom</u>. <u>United States - Import Prohibition of Certain Shrimp Products</u>, WT/DS58/R (15 May 1998), and during an appeal therefrom by the United States to that organization's Ap- pellate Body, which issued its decision on October 12, 1998 <u>viz</u>. <u>United States - Import Prohibition of Certain Shrimp and Shrimp Products  Report of the Appellate Body</u>, WT/DS58/AB/R.  <u>See</u> De-fendants' Public Appendix 3, Defendants' Response in Opposition to Plaintiffs' Application for Attorneys' Fees, Costs and Ex-penses [cited <u>infra</u> as "Defendants' Opposition to Fees"].

[3] 63 Fed.Reg. at 46,095.  The acronym "TEDs" refers to var-ious turtle excluder devices.  <u>See generally</u> <u>Earth Island Insti-tute v. Christopher</u>, 19 CIT 1461, 1463 and 913 F.Supp. 559, 563, n. 1 (1995), and references cited therein.  For more recent de-velopments, see, for example, Department of Commerce, National  Oceanic and Atmospheric Administration, <u>Endangered and Threaten-ed Wildlife;</u>

Those concerns were stated to be that foreign harvesters will fraudulently claim that shrimp have been harvested with TEDs, that foreign nations which have established regulatory programs comparable to the U.S. program will abandon or limit them so that only trawlers harvesting shrimp for export to the United States will actually employ TEDs, and that other nations which may be considering the adoption of such a program may opt instead for equipping only those vessels trawling for shrimp for the Ameri-can market. See 63 Fed.Reg. at 46,095.

Following publication in Geneva of the WTO Appellate Body's report, and just before this court's slip op. 99-32 was handed down, the Department of State issued its Notice of Proposed Revisions to Guidelines for the Implementation of Section 609 of Public Law 101-162 Relating to the Protection of Sea Tur-tles in Shrimp Trawl Fishing Operations[4], advising, among other things, that on

    November 25, 1998, the United States announced its inten-
    tion to implement the recommendations and rul- ings of the

Sea Turtle Conservation Requirements, 65 Fed.Reg. 17,852 (April 5, 2000).

The statute cited is Pub.L.No. 101-162, §609, 103 Stat. 988, 1037-38 (1989), which is codified at 16 U.S.C. § 1537 note and reprinted in full in slip op. 99-32, 23 CIT at __, 48 F.Supp.2d at 1066-67, and which will be referred to as "section 609".

[4] 64 Fed.Reg. 14,481 (March 25, 1999) [referred to herein-after as "March 1999 Notice of Revisions"].

> DSB in a manner which is consistent     not only with
> U.S. WTO obligations, but also with     the firm commitment
> of the United States to the   protection of threatened and
> endangered species,     including sea turtles.

64 Fed.Reg. at 14,481.  This notice then summarized the findings of

the Appellate Body report and offered responses on the part of the

United States as follows:

> (1) <u>WTO Finding</u>: While Section 609 requires as     a
> condition of certification that foreign programs     for
> the protection of sea turtles in the course of shrimp
> trawl fishing be *comparable* to the U.S. pro-   gram, the
> practice of the Department of State in mak-ing certifica-
> tion decisions was to require foreign programs to be
> *essentially the same* as the U.S. program.  In assessing
> foreign programs, the Department   . . . should be more
> flexible in making such determi-nations and, in particu-
> lar, should take into consider-ation different conditions
> that may exist in the ter-ritories of those other nations.

> <u>Analysis</u>: . . . [T]he proposed revisions to the
> guidelines make clear that the Department of State  will
> fully consider any evidence that another nation may pres-
> ent that its program to protect sea turtles   in the
> course of shrimp trawl fishing is comparable   to the U.S.
> program.  In reviewing such evidence, the Department will
> take into account any demonstrated differences in foreign
> shrimp fishing conditions, to the extent that such differ-
> ences may affect the extent to which sea turtles are
> subject to capture and drown-ing in the commercial shrimp
> trawl fisheries.  The De-partment will also take such
> differences into account in making related determinations
> under Section 609.

> (2) <u>WTO Finding</u>:  The certification process under
> Section 609 is neither transparent nor predictable and
> denies to exporting nations basic fairness and due pro-
> cess.  There is no formal opportunity for an applicant
> nation to be heard or to respond to arguments against it.
> There is no formal written, reasoned decision.  But for
> notice in the **Federal Register**, nations are  not notified

of decisions specifically.  There is no procedure for review of, or appeal from, a denial of certification.

Analysis: . . . [T]he proposed revisions to the guidelines institute a broad range of procedural changes in the manner in which the Department of State will make certification decisions under Section 609.  The intention is to create a more transparent and predicta-ble process for reviewing foreign programs and for mak- ing decisions on certifications and other related mat-ters.  The pro-posed revisions ensure that the governments of harvesting nations will be notified on a time- ly basis of all pend-ing and final decisions and are provided a meaningful opportunity to be heard and to present any additional information relevant to the  certification decision. The governments of harvesting nations that are not granted a certification shall re- ceive a full explanation of the reasons that the cer-tification was denied.  Steps that the government must take to receive a certification in the future shall be clearly identified.  . . .

(3) <u>WTO Finding</u>:  At the time the WTO complaint arose, the United States did not permit imports of shrimp harvested by vessels using TEDs comparable    in effectiveness to those used in the United States, unless the harvesting nation was certified pursuant   to Section 609. In other words, shrimp caught using methods identical to those employed in the United States had been excluded from the United States mar- ket solely because they had been caught in waters of uncertified nations.

<u>Analysis</u>: . . . [T]he Department of State modi-fied its implementing Guidelines on August 28, 1998   to allow the importation of shrimp harvested by ves-sels using TEDs, even if the exporting nation is not certified pursu-ant to Section 609.  This policy had,  in fact, been in place as of April 19, 1996, but had been overturned by a domestic court ruling that was subsequently vacated.  The provisions of the August  28, 1998 Guidelines pertaining to the importation of such shrimp remain in effect.

(4) <u>WTO Finding</u>: The United States failed to en-gage the nations that brought the complaint, as well   as other WTO Members exporting shrimp to the United States, in serious across-the-board negotiations, a- part from nego-tiations on the Inter-American Conven-tion for the Protec-tion and Conservation of Sea Turtles, for the purpose of concluding agreements to   conserve sea turtles before enforcing the import pro-hibition on those other Members.

<u>Analysis</u>:  As early as 1996, the United States proposed to governments in the Indian Ocean region   the negotiation of an agreement to protect sea tur- tles in that region, but received no positive re-     sponse. In 1998, even before the WTO Appellate Body issued its re-port, the United States reiterated its desire to enter into such negotiations with affected governments, includ-ing those that had brought the   WTO complaint. During the summer of 1998, the United States informally approached several governments in  the Indian Ocean re-gion, as well as numerous non-gov-ernmental organizations, in an effort to get such ne-gotiations underway.  On October 14, 1998, following the issuance of the Appellate Body report, but before its adoption by the DSB, the Department of State form-ally renewed this proposal to

high-level representatives of the embassies of the four
complainants in Washington, D.C., and delivered the same
message to

a wide range of nations in the Indian Ocean region through
. . . embassies abroad.  In each case, the  United States
presented a list of "elements" that . . . could form the
basis of such an agreement . . . [and] made clear the
willingness of the United States to support the negotiat-
ing process in a number of ways.   . . .

(5) <u>WTO Finding</u>: As compared to the 14 nations of the
Caribbean and western Atlantic that were initially af-
fected by Section 609, the United States provided less
technical assistance to those nations that first became
affected by the law at the end of 1995 as a re-sult of the
decision of the U.S. Court of International Trade.

<u>Analysis</u>: The United States has renewed, and here- by
reiterates, its offer of technical training in the design,
construction, installation and operation of TEDs to any
government that requests it.  Any government that wants to
receive such training need only make such a request to the
United States in writing, through diplomatic channels.
The United States will make every effort to meet such
requests.  Training programs will be scheduled on a first
come, first served basis, al-though special efforts will
be made to accommodate na- tions whose governments are
making good faith efforts to adopt and maintain nation-
wide TEDs programs and who have not previously received
such training.  In this way, the United States hopes to
create an additional incentive in favor of such programs.

<u>Id</u>. at 14,481-82 (emphasis in original).

Nonetheless, this court was constrained to conclude in

slip op. 99-32 yet again that paragraph (1) of section 609(b) is

specifically contingent upon the certification procedure established

by section 609(b)(2), which offers the only congressional- ly-ap-

proved breaches of the embargo, either via subparagraphs (A) and (B) or through (C).  Paragraphs (b)(1) and (b)(2) are *pari materia*; they cannot be read independently, or out of the context adopted by Congress, including section 609(a), to slow or stanch

the extinction of species of sea turtles.  And so long as the U.S. government reports that the "foundation of the U.S. program" continues, with "limited exceptions", to be that "all other com-mercial shrimp trawl vessels operating in waters subject to U.S. jurisdiction in which there is a likelihood of intercepting sea turtles must use TEDs at all times", the catch of vessels equipped with TEDs from nations without such comparable foundation continues subject to embargo.[5]  Whereupon the court held in slip op. 99-32 that the part of the 1998 Revised Guidelines which constituted the decision to permit the importation of TED-caught shrimp from uncertified nations, on its face, was not in accord-ance with section 609.  But it also decided that, before any entry of judgment on plaintiffs' motion herein, the court would await defendants' annual report to Congress pursuant to section 609(b)(2), their report to the court on any responses to their March 1999 Notice of Revisions, and the present-ment of evidence regarding the actual enforcement of the 1998 Revised

---

[5] 23 CIT at _, 48 F.Supp.2d at 1081, quoting the 1998 Re-vised Guidelines, 63 Fed.Reg. at 46,095.  See March 1999 Notice of Revisions, 64 Fed.Reg. at 14,482:

> The commercial shrimp trawl fisheries in the Unit- ed States in which there is a likelihood of intercept-ing sea turtles occur in the temperate waters of the Gulf of Mexico and the Atlantic Ocean from North Caro- lina to Texas.  With very limited exceptions, all U.S. commercial shrimp trawl vessels operating in these waters must use approved TEDs at all times and in all areas.

Guidelines,

as well as of guidelines in effect between April and November of
1996.[6]


                                   A

        Since issuance of slip op. 99-32, the defendant(s) have
reported to Congress on or about May 1st of 1999 and of 2000, as
required by section 609.[7]  Among other things, Congress was re-
assured that, with certain "limited exceptions", the foundation of
the U.S. program continues to be that all commercial shrimp trawl
vessels operating in waters subject to U.S. jurisdiction  in which
there is a likelihood of intercepting sea turtles use TEDs at all
times.[8]

---

[6] 23 CIT at _, 48 F.Supp.2d at 1081, referring to Dep't of State, Revised Notice of Guidelines for Determining Comparability of Foreign Programs for the Protection of Turtles in Shrimp Trawl Fishing Operations, 61 Fed.Reg. 17,342 (April 19, 1996).

[7] See Defendants' Response to Court Order of April 2, 1999, Declaration of David A. Balton (July 1, 1999) [hereinafter "1999 Balton Declaration"], Tab A, first three pages; Defendant's Re-sponse to the Court's Instructions of April 4, 2000, Attachment  1.

[8] 1999 Balton Declaration, Tab A, first two pages; Defend-ant's Response to the Court's Instructions of April 4, 2000, At-tachment 1, pp. 1-2.

        In 1999, twelve nations were initially certified as having comparable regulatory programs. Panama and Costa Rica and then Guyana were added to that list.  Compare 1999 Balton Declaration, Tab A, second and third pages with id., fourth to seventh pages.

        This year, 16 nations, including the foregoing three, have been certified.  See Defendant's Response to the Court's Instruc-tions of April 4, 2000, Attachment 1, pp. 2-3; Dep't of State, Bureau of Oceans and Int'l Environmental and Scientific Affairs; Certifications Pursuant to Section 609 of Public Law 101-162, 65 Fed.Reg. 25,785 (May 3, 2000).

The defendants have also reported to the court via dec-

larations of the Director of the Office of Marine Conservation, U.S.

Department of State, David A. Balton, dated July 1, 1999 and May 1,

2000[9], and of the Director, Trade Programs, U.S. Customs Service

Office of Field Operations, Elizabeth G. Durant.  The latter trans-

mits copies of instructions issued by Customs between May 1995 and

June 1999 to its Regional, District, Area, and Port Directors regard-

ing enforcement of the embargo established by Congress in section

609.  Director Durant produces a copy of the State Department's

*Shrimp Exporter's/Importer's Declaration*, Form DSP-121, and attests

that shrimp imports from all harvesting nations must be accompanied

by the form.  In the case of shipments from countries not certified

by the Department in accord-ance with the statute, the form must be

"signed by an exporter and harvesting government official."  Durant

Declaration, para. 2.  See id., Attachment A.  On the other hand,

> [i]mports from harvesting nations which have been cer-tified
> by the State Department as utilizing an accept-able method
> of shrimp/prawn harvesting are required to  be accompanied
> by a completed DSP-121 signed by the ex- porter, and the
> importer is required to maintain this form for five years in
> accordance with Customs record keeping requirements. These
> entries are subject to lat- er DSP-121 form verification by
> Customs and/or State Department.

Id., para. 4.  On his part, Director Balton produces copies of

---

[9] As with the Director's earlier declaration, this later one will be cited by this year alone.

Department of State correspondence relevant to the period April -

November 1996.  See generally 1999 Balton Declaration, para. 5 and

Tab C.  Tab B thereto is a copy of the Department's original Public

Notice 3086, which sets forth the responses to its March 1999 Notice

of Revisions, and which has been published sub nom. Revised Guide-

lines for the Implementation of Section 609 of   Public Law 101-162

Relating to the Protection of Sea Turtles   in Shrimp Trawl Fishing

Operations, 64 Fed.Reg. 36,946 (July 8, 1999).  It reports a total of

eleven responses, five from governments or their agencies, including

Australia, India, Malaysia  and Thailand, with the remainder submit-

ted by nongovernmental or environmental organizations and an individ-

ual, at least one of which is a named party plaintiff herein. While

reiterating that the March 1999 Notice of Revisions sought public

reaction to those aspects of the WTO decision that were intended to

be ad-dressed through the proposed changes to the guidelines, as set

forth in sections II and III of that notice[10], the Department reports

the

> governments and organizations that submitted comments did
> not limit those comments to Sections II and III    . . ..
> Instead, many . . . responded to other parts  of the
> notice, particularly to the current policy of permitting
> importation of shrimp harvested by vessels equipped with .
> . . TEDs[] in uncertified nations, for which the Depart-

---

[10] 64 Fed.Reg. at 36,946.

ment proposed no change.

64 Fed.Reg. at 36,946.  <u>See</u> <u>also</u> <u>id</u>. at 36,948.  And it responded to those particular comments as follows:

> The Department of State recognizes the strongly held
> views on all sides of this issue, and notes that the issue
> is also the subject of on-going litigation before the U.S.
> Court of International Trade. In light of these circum-
> stances, the Department has determined that it will make
> no change to the current policy at this time.

Id. Following its responses to the comments received, the De-

partment states:

> For the sake of clarity, the August 28, 1998  guide-
> lines are restated below as modified to re-  flect the
> changes proposed in the **Federal Register** notice issued
> March 25, 1999, and the comments re-ceived on those pro-
> posed changes.

Id. at 36,949 (bold typeface in original).  See generally id. at 36,949-52.

Whatever the modifications, the court takes note that these guidelines, issued in 1998

and reissued in 1999, continue to inform the world that the foundation of the U.S. program, as

described above, remains in effect.  Compare 64 Fed.Reg. at 36,949, § I(A) with 1998 Revised

Guidelines, 63 Fed.Reg. at 46,095, cols. 2-3.  However, each issuance also continues the following

stated approach, albeit not entirely *in haec verba*:

> Shrimp Harvested in a Manner Not Harmful to Sea Turtles.  The Department
> prohibitions imposed pursuant to Section 609 do not apply to shrimp or products of
> shrimp harvested under the following conditions, since such harvesting does not
> adversely affect sea turtles:

*   *   *

   b. Shrimp harvested by commercial shrimp trawl vessels using TEDs compara-
ble in effectiveness to those required in the United States. . . .

63 Fed.Reg. at 46,096. Cf. 64 Fed.Reg. at 36,949, § I(B).

(1)

   This approach remains at the core of this case and con- troversy. According to the

submissions to date herein, shrimp shipments from only one nation, Brazil, have been granted U.S. entry

pursuant to the foregoing, published Department determina-tion. Director Balton reports as follows

thereon:

   6. Brazil remains the only nation not certified un- der Section 609 that is exporting
   shipments of TED-caught shrimp to the United States. . . . Brazil has two
   shrimp fisheries that are separat- ed by hundreds of miles (one in the north, one in
   the south). Although Brazilian law requires all commercial shrimp trawl vessels
   to use TEDs, evi- dence continues to indicate that the law is only being
   adequately enforced in the northern shrimp fishery. This situation arose well
   before August 1998, when the Department reinstated the policy at issue in this
   case.

   7. Brazil remains uncertified today because of inade- quate enforcement of its TEDs
   rules in its southern fishery. Until such time as Brazil is eligible to be certified,
   the policy of the Department is to permit imports of shrimp harvested in its
   northern fishery, provided that the Government of Brazil con- inues to enforce its
   TEDs rules in its northern fishery and maintains a system to segregate TED-
   caught shrimp harvested in its northern fishery from other shrimp harvested in its
   southern fishery.

   8. However, Brazil has recently taken an important step toward certification. Brazil
   recently ratified the Inter-American Convention for the Protection and Conser-
   vation of Sea Turtles, which requires compre- hensive use of TEDs. Although the
   Convention is not yet in force, it should enter into force by the
   end of this year. At that point, the United States will be in a much stronger
   position to press the Government of Brazil to achieve and maintain ade- quate
   enforcement of its TEDs rules in both of its shrimp fisheries. If that happens, Brazil

will be     eligible for certification under Section 609.[11]

He also reports, however, that the federal government of Australia began as of April 15, 2000 requiring TEDs in its northern prawn fishery in order to gain access to the U.S. market for catch therefrom, based upon the foregoing, contested Department determination.  That is,

> [d]espite the requirement to use TEDs in this large fishery, Australia is not yet eligible for certification under Section 609, due to the fact that the Commonwealth, State and Territorial Governments in Australia, which regulate shrimp fisheries in other areas,  do not yet require TEDs use.[12]

_____

[11] 2000 Balton Declaration, pp. 2-3.  See also 1999 Balton Declaration, Tab C (Dep't of State Action Memorandum, Status of Shrimp Imports from Brazil under Section 609 of Public Law 101-162 (Dec. 18, 1998)); (Report on Trip to Brazil (Oct. 27-29, 1998)).

The stance of the Customs Service with regard to Brazil,  and to other countries not certified pursuant to section 609,   is stated to be:

> While Brazil is not a certified nation, the State Department has determined that Brazil conducts some commercial shrimp fishing operations using TEDS. There-  fore, imports of shrimp, prawns and products thereof  from Brazil may be released from Customs custody if the entry is accompanied by a DSP-121 with block 7(2) check-ed, indicating that the shrimp has been harvested using TEDs.  Shrimp/prawn entries from any other uncertified nation accompanied by a form DSP-121 with block 7(2) checked constitute improper claims.  These shipments   are not released from Customs custody and are prohibi- ted from entry into the commerce of the United States.

Durant Declaration, para. 3.

[12] 2000 Balton Declaration, para. 10, pp. 3-4.  Cf. Determi-nation by the Department of State Regarding Shrimp Imports From the Spencer Gulf in Southern Australia, 64 Fed.Reg. 57,921 (Oct. 27, 1999).

Whereupon the declarant opines:

> . . . Based on discussions with Australian officials, it is my belief that, were the Depart-
> ment to deny im-portation of shrimp from the northern prawn fishery, we would
> weaken Australia's commitment to use TEDs in this large fishery.

2000 Balton Declaration, para. 11.

Be that as it may, Director Balton, in reporting on the status of negotiations with the governments in the Indian Ocean region for an agreement along the lines of the Inter-American Convention for the Protection and Conservation of Sea Turtles[13] and on the aftermath of the WTO proceedings, claims to be able to still confirm that

> no foreign government that had previously established a nation-wide TEDs program
> has abandoned or limited such program in favor of exporting TED-caught shrimp to the
> United States in the absence of such a national program.

Id., para. 3.

The intervenor-defendant National Fisheries Institute, Inc. ("NFI"), which is a "national trade association . . . [of] approximately 1,000 member companies involved in the United States fish and seafood industry"[14], also reports that, as far as it is aware,

---

[13] *Done* Dec. 1, 1996 at Caracas, Venezuela, S. Treaty Doc. No. 105-48 (1998).

[14] Declaration of Richard E. Gutting, Jr., para. 2 (Sept. 22, 1998).

Brazil has been the only uncertified nation shipping shrimp harvested by mechanized trawl vessels equipped with Turtle Excluder Devices ("TEDs") to the United States.

Intervenor-Defendant's Response to the Court's Order of April 2, 1999.  Submitted with this response were reports sworn to by representatives of two NFI members which declare importation of shrimp caught by such vessels in 1996 and since August 1998.  They attach copies of the forms that allegedly accompanied some of those firms' shipments during those periods.

The court has perused each of them.  Those appended to the Declaration of Claude Schoeffer appear to be, as attested, copies of executed Department of State forms DSP-121, which he claims his company maintains on file for at least five years.  The declaration on behalf of the second NFI member, Harbor Sea-food, Inc., New Hyde Park, New York, also claims a similar re-tention policy and purports to present copies of "fully executed DSP-121s, signed by the exporter and a responsible government official,"[15] but none actually is such.  While each resembles the prescribed U.S. State Department document in terms of format and content, each, on its face, is a document issued in the name of the Instituto Brasileiro do Meio Ambiente e dos Recursos Naturais Renováveis - IBAMA, which apparently is a governmental agency of Brazil.[16]  Indeed, the primary language on these exhibits is Por-tuguese, albeit with a secondary English translation provided.  The prescribed DSP-121 *Shrimp Exporter's/Importer's Declaration* contains a check-box in part 7 labelled "Harvested in the waters of

---

[15] Declaration of Douglas Deerin, para. 4, p. 2 (July 1, 1999).  See Declaration of Claude Schoeffer, para. 4, p. 2 (July 1, 1999).

[16] Cf. 1999 Balton Declaration, Tab C (Report on Trip to Brazil (Oct. 27-29, 1998)).

a *nation* currently certified pursuant to Section 609 of P.L. 101-162"[17], whereas the IBAMA would-be equivalent checkpoint has the written annotation *Capturado em águas de uma região atualmente certificada de acordo com a Seção 609 da P.L. 101-162*, which is translated on the form as "Harvested in the waters of a *region* currently certified pursu . . .." E.g., Declaration of Douglas Deerin (July 1, 1999), Tab A, first sheet (05/20/1996) (emphasis added). Of course, as this court held in this case's precursor, CIT No. 94-06-00321, section 609 does not contemplate *region*al certification, nor have the defendants attempted to renew any such transmogrification since then. Finally, the court notes in passing that the first two copies comprising declarant Deerin's Tab A show as the U.S. importer/ultimate consignee a Long Shore Sea Food Co of Panama City, presumably in Florida[18], as opposed to New Hyde Park or elsewhere in the hemisphere.

---

[17] See, e.g., Durant Declaration, Attachment A (emphasis added).

[18] In fact, all of the Tab B exhibits to the Declaration of Claude Schoeffer specify a firm in that state instead of his com- pany, Expack Seafood, Inc. of Edison, New Jersey, as the actual U.S. importer.

B

On their part, the plaintiffs reaffirm that their

> objective in initiating th[is] lawsuit [h]as [been]   to prohibit the government from implementing a "ship-ment by shipment" approval process for the importa- tion of TED-caught shrimp and shrimp products from   uncertified nations, in direct contravention of the  plain terms and purpose of the Turtle Law.[19]

Plaintiff Steiner, the experienced Director of the Sea Turtle Restoration Project[20] of the plaintiff Turtle

Island Restoration Network, takes issue with the above-stated views of State Department Director

Balton, in part, as follows:

> 5. First, . . . the government's interpretation   and implementation of Section 609 to allow the impor-tation of individual shipments of wild-caught shrimp and shrimp products from uncertified nations, aside from being contrary to the law, will lead to weakened protections for endangered sea turtles.  I base this opinion on my past experience in dealing with various nations on this issue.  Mr. Balton's assertion that   to date no nations have abandoned a national certifi-cation program in favor of a shipment-by-shipment cer-tification program[] is not proof that nations ultimately will not abandon national standards in the future.  Indeed, since this case is still in litigation, and particularly in light of the Court's April 2, 1999 ruling, nations desiring to sell shrimp in the United States would not revert to the weaker shipment-by-shipment import standards, since legal uncertainty over their validity remains.

---

[19] Declaration of Todd Steiner in Support of Plaintiffs' Ap-plication for Attorneys' Fees, Costs and Expenses, para. 9, p. 3 (May 2, 2000).

[20] The court notes in passing that the record of this case, and of its predecessor case, CIT No. 94-06-00321, reflects co-operation by this Project with the U.S. government in various sea-turtle-related endeavors around the world. See, e.g., Dec-laration of Todd Steiner in Response to Declaration of David A. Balton, paras. 10(a), 10(b) (May 5, 2000).

6.  Also, . . . maintaining a shipment-by-shipment importation policy will do little to encourage nations to consistently enforce domestic laws protective of   sea turtles.  For instance, Brazil has a national law requiring the use of TEDs on its shrimp fleet for both the Northern and Southern fisheries.  Yet, Brazil has failed to enforce that law in the Southern fishery     . . ..  The U.S. State Department's current shipment-  by-shipment Guidelines provide no incentive for Brazil to commence nationwide enforcement.  To the contrary,  by allowing Brazilian shrimp to be exported to the Unit- ed States, the State Department has reduced the incent-ives for Brazil to fully enforce its own law, result- ing in the unnecessary deaths of endangered sea tur-tles.  Congress never intended for nations such as Bra- zil to profit from access to the lucrative U.S. market while still failing to maintain protections for sea turtles in its entire fleet that are comparable to the protections required of the U.S. fleet.  Ratification  of the Inter-American Treaty . . . does not alter Con-gress' intent that countries be certified under U.S.  law nor . . . does it provide the strongest mechanism  by which to press Brazil to adopt nationwide stan-dards.

7.  I further disagree with Mr. Balton's assertion that a return to nationwide stan-dards, as opposed to maintenance of the shipment-by-shipment standard, will precipi-tate a WTO challenge.  In fact, the likelihood of such a challenge is the same under either interpre-tation of the Guidelines.  For instance, it is my un-derstanding that Malaysia is planning to challenge the current shipment-by-shipment implementation of the State Department's Guidelines, and merely is waiting for Congress to vote for the renewal of its membership in the WTO.

8.  I also believe that Mr. Balton's opinion that the Indian Ocean agreement might be jeopardized by a return to nationwide standards is unfounded.  First, there is no Indian Ocean agreement, only a broad con-sensus among nations to begin discussing such an agreement.  Secondly, even if eventually a formal agreement is entered into, there is no guarantee that it will ad- dress TEDs or include enforcement mechanisms relating to their use, or even that it will ever be ratified.  To the extent that Mr. Balton believes such an agreement will be jeopardized by further WTO proceedings, the fault should not lie with the enforcement of na-tionwide standards.  Rather, as stated above, Malaysia

plans to challenge the United States' implementation of the WTO decision despite the adoption of shipment-by-shipment importation policy.  Lastly, it is worth not-ing that negotiations toward the conclusion of the In-ter-American Agreement were com-menced during the time when nationwide standards were in force, yet were not hindered by that policy.

9.  Mr. Balton also states that Australia's prime motivation for placing TEDs on some of its shrimp ves-sels was to gain access to the U.S. market.  Yet, by allowing Australia to import shrimp into the United States on a shipment-by-shipment basis, the government has eliminated any incentive for Australia to ensure that all of the vessels in its fleet use TEDs. As mat- ters currently stand, only about half of Australia's vessels use TEDs, and sea turtles that migrate along the coast between Australia's fisheries continue to drown needlessly in shrimp nets.

Declaration of Todd Steiner in Response to Declaration of David A. Balton (May 5, 2000).

Prior to this submission, plaintiffs' counsel had re-sponded that defendants' claim that

the use of TEDs in Brazil's northern fishery provides significant environmental benefit

is an illusory argument . . . as use of TEDs in the north only saves these migratory turtles so that they can die in Brazil's southern fishery, where no TEDs are used.  . . . Nor have Defendants independently verified that shrimp from the south do not end up in exports to the United States.  Pre-announced inspections in the north . . . simply lead to installation of new TEDS to create an appearance of compliance where none exists.

Letter from Joshua R. Floum, Esq., first page (July 21, 1999). Submitted in support of this response is an eleven-page document sub nom. Sea Turtles of Brazil (June 1999), including extensive bibliography and a map of the fisheries along the considerable coastline of that country, attributed to Randall Arauz, Director, Latin American Program of the Sea Turtle Restoration Project.  The Executive Summary is stated to be:

>    Five species of sea turtles occur in both the North  and South coast of Brazil.  Available
>    evidence from  tag returns and genetic studies suggests that indi-vidual turtles move
>    between these two regions.  While the shrimp fisheries occurring in the North and South
>    of Brazil may be distinct, the sea turtles found off the coast of Brazil move through both
>    these regions   in their annual migrations.  In addition, Brazil may  be an important
>    foraging area for sea turtles that  nest in several nations other than Brazil.

In addition to reporting in detail on the nature of those partic- ular species, namely, green turtle (*Chelonia mydas*), hawksbill (*Eretmochelys imbricata*), leatherback (*Dermochelys coriacea*), loggerhead (*Caretta caretta*), and olive ridley (*Lepidochelys olivacea*), each of which is considered "endangered" and/or "threatened" within the meaning of the U.S. Endangered Species Act[21], and also reporting on their incidental captures by artisi-nal fishing, purse seine nets, or long lines targeting sharks, tuna or swordfish, the author refers to a study regarding strand- ings and briefly to industrial shrimping activities.  As to that last phenomenon, in Brazilian waters as well as elsewhere, plaintiffs' counsel further contends that

>    troubling enforcement issues remain worldwide. The DSP-121 form remains in the
>    hands of importers.  Customs does not have a list of accepted signatures of foreign
>    government officials, to guard against widespread forg- ery.  The actual source of
>    individual shrimp ship- ments is even harder to ascertain, and is another reason to reject
>    the shipment-by-shipment guide- lines.

Letter from Joshua R. Flom, Esq., first page (July 21, 1999).

II

Section 609 is part of the Endangered Species Act.  Nonetheless, in the predecessor

---

[21] 16 U.S.C. §1531 et seq.  Compare 50 C.F.R. §223.102(d) (1999) with id., §224.101(c).  See also Earth Island Institute  v. Christopher, 19 CIT 812, 815, 890 F.Supp. 1085, 1088-89 (1995).

case to this one, CIT No. 94- 06-00321, the Court of Appeals for the Federal Circuit read <u>Bennett v. Spear</u>, 520 U.S. 154 (1997), to mean that that act "does not authorize, and cannot support, an award of [attorneys'] fees" in this matter. <u>Earth Island Institute v. Albright</u>, 147 F.3d 1352, 1357 (Fed.Cir. 1998). Whereupon, after remand of that proceeding, this court approved such an award to the plaintiffs under EAJA. <u>See</u> <u>Earth Island Institute v. Albright</u>, 22 CIT __, Slip Op. 98-151 (Nov. 4, 1998).

Relying, as indicated above, on that latter enactment, come now the plaintiffs with an application on CIT Form 15 for an award herein of fees for their attorneys in the amount of $162,066.25, plus related expenses of $3,960.18. The defendants take the position that the facts and circumstances of this case do not satisfy the standards set by EAJA for such an award. They argue that the plaintiffs are not "prevailing parties" herein; that, if the court were to hold otherwise on that threshold is-sue, the government's position is and has been "substantially

justified"; and that, if not so justified, any award should be limited due to "deficiencies" in plaintiffs'

application as pre-sented.[22]  The sections of the statute thus implicated are as follows:

> (d)(1)(A) . . . [A] court shall award to a pre-vailing party other than the United States fees and other expenses, in addition to any costs awarded pur-suant to subsection (a), incurred by that party in   any civil action . . . , including proceedings for judicial review of agency action, brought . . .   against the United States in any court having juris-diction of that action, unless the court finds that  the position of the United States was substantially justified or that special circumstances make an award unjust.

> (B) A party seeking an award of fees and other   expenses shall . . . submit to the court an applica-tion for fees and other expenses which shows that the party is a prevailing party and is eligible to receive an award under this subsection, and the amount sought,   including an itemized statement from any attorney or expert witness representing or appearing in behalf of the party stating the actual time expended and the rate at which fees and other expenses were computed.  The party shall also allege that the position of the United States was not substantially justified. Wheth- er or not the position of the United States was substantially justified shall be determined on the basis of the record (including the record with respect to  the action or failure to act by the agency upon which the civil action is based) which is made in the civil action for which fees and other expenses are sought.

*  *  *

---

[22] See, e.g., Defendants' Opposition to Fees, p. i.  Those deficiencies are alleged to include failure to justify an hour- ly attorney's rate higher than $125; failure to demonstrate any special factor warranting more than that statutory amount for  time spent preparing the EAJA application itself; and improper claims for activities undertaken by a legal assistant or unre-lated to this case.  See generally id. at 21-28.

(2) For the purposes of this subsection -

    (A) . . . (The amount of fees awarded . . . shall be based upon prevailing market rates for the kind and quality of the services furnished, except that . . . (ii) attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an in-crease in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee.);

    (B) "party" means (i) an individual whose net worth did not exceed $2,000,000 at the time the civil action was filed, or (ii) any owner of an unincorporated business, or any partnership, corporation, association, unit of local government, or organization, the net worth of which did not exceed $7,000,000 at the time the civil action was filed, and which had not more than 500 employees at the time the civil action was filed; except that an organization described in section 501(c)(3) of the Internal Revenue Code of 1986 (26 U.S.C. 501(c)(3)) exempt from taxation under section 501(a) of such Code . . . may be a party regardless of the net worth of such organization or cooperative association . . . ;

    (C) "United States" includes any agency and any official of the United States acting in his or her official capacity;

    (D) "position of the United States" means, in ad-dition to the position taken by the United States in the civil action, the action or failure to act by the agency upon which the civil action is based; . . .[23]

## A

    The application at bar shows, and the court finds, that, with the exception of the Sierra Club[24], each of the plain-

---

[23] 28 U.S.C. §2412(d).  As stated, costs can also be awarded to the prevailing party pursuant to subsection 2412(a).

[24] See Plaintiffs' Application for Attorneys' Fees, Costs and Expenses, p. 7, n. 4 ("Sierra Club is not a 'party' under EAJA's definition").

tiffs named in the caption hereto is a "party" within the meaning of the foregoing statute.  Other than a

case of eminent domain, however, EAJA does not define "prevailing" party, which issue has thus been

left to the courts.  In Hensley v. Eckerhart, 461 U.S. 424, 433 (1983), the Supreme Court pointed out

that the

> standard for making this threshold determination    has been framed in various ways.  A
> typical formu-lation is that "plaintiffs may be considered 'pre-vailing parties' for attor-
> ney's fees purposes if    they succeed on any significant issue in litigation which achieves
> some of the benefit the parties sought in bringing suit."[25] . . .  This is a generous formu-
> lation that brings the plaintiff only across the stat-utory threshold.  It remains for the
> district court   to determine what fee is "reasonable."

This approach has been followed by the Federal Circuit, e.g., Singer v. Office of the Senate Sergeant at

Arms, 173 F.3d 837,  841 (Fed.Cir. 1999), and by the Court of International Trade, e.g., Former

Employees of Shaw Pipe, Inc. v. U.S. Sec'y of    Labor, 22 CIT __, __, 9 F.Supp.2d 713, 715

(1998).

>        To follow it yet again in this case leads the court to conclude without reservation that

the plaintiffs have *prevailed* on the threshold issue of whether defendants' approach to shipments to this

country of shrimp snagged by trawls equipped with TEDs through the waters of nations not formally

certified to Con- gress by the State Department under section 609 violates that statute on its face.  This

court has opined that it does, has granted plaintiffs' motion for summary judgment thereon, and  will so

---

[25] Quoting Nadeau v. Helgemoe, 581 F.2d 275, 278-79 (1st Cir. 1978), and citing Busche v.
Burkee, 649 F.2d 509 (7th Cir.) cert. denied, 454 U.S. 897 (1981); Taylor v. Sterrett, 640 F.2d 663
(5th Cir. 1981); Sethy v. Alameda County Water Dist., 602 F.2d 894 (9th Cir. 1979), cert. denied,
444 U.S. 1046 (1980).

declare in the final judgment entered herewith.


                                                    B

          To the extent any party to this controversy, genuine-ly, has not understood the timing of

this finalization herein, suffice it to recite now from the pledge published as part of  the original object of

plaintiffs' complaint, the 1998 Revised Guidelines, to wit:


          The Department of State will engage in ongoing consultations with harvesting
     nations.  The Depart- ment recognizes that, as turtle protection programs develop,
     additional information will be gained about the interaction between turtle populations
     and shrimp fisheries.  These Guidelines may be revised in the future to take into
     consideration that and other in-formation, as well as to take into account changes in the
     U.S. program.

          In addition, the Department seeks public comment on the best ways to imple-
     ment both these guidelines  and Section 609 as a whole and may revise these guidelines
     in the future accordingly.


63 Fed.Reg. at 46,097.  In other words, the defendants needed sufficient opportunity to contemplate

and to exercise their con-siderable discretion, to report thereon to the Congress, and to duly advise, if

not coordinate with, the rest of the affected world of international trade.  At the same time, the plaintiffs

would be afforded adequate chance to bear witness to that appli-cation of presidential prerogatives,

and to consider or recon-

sider their position thereon.  Moreover, while that position had been that the defendants be enjoined

immediately from relying on that part of their guidelines which is violative of section 609 on its face, the

decision of whether or not to grant such equi-table relief, which is truly extraordinary in the field of

Amer-ica's foreign affairs[26], required evidence not available at the time slip op. 99-32 was handed

down.

Most of the evidence submitted since then, such as    it is, appears or is referred to in

part I, supra.  The essence of plaintiffs' position remains that defendants' misinterpretation of the statute

requires that an injunction issue without  any further ado.  See, e.g., Letter from Joshua R. Floum, Esq.

(Jan. 5, 2000).  But their application for fees and expenses re-quires the court to now revisit the merits

of their case anyway to determine whether or not the position of the United States is "substantially

justified".

Again, Congress has not defined that controlling standard in EAJA; courts have had to

do so.  Both sides refer this court to Pierce v. Underwood, 487 U.S. 552 (1988), and Gavette v.

Office of Personnel Management, 808 F.2d 1456 (Fed. Cir. 1986).  In the first matter, the opinion of

the Supreme Court states:

---

[26] See generally Crosby v. Nat'l Foreign Trade Council, __S.Ct. __ (June 19, 2000), and cases
cited therein.

We are of the view . . . that as between the    two commonly used connotations of the word "sub-    stantially," the one most naturally conveyed by      the phrase before us here is not "justified to a    high degree," but rather "justified in substance or in the main" -- that is, justified to a degree    that could satisfy a reasonable person. That is     no different from the "reasonable basis both in      law and fact" formulation adopted by the Ninth Cir- cuit and the vast majority of other Courts of Ap-  peals that have addressed this issue. . . . To be "substantially justified" means, of course, more than merely undeserving of sanctions for frivolous-ness; that is assuredly not the standard for Govern-ment litigation of which a reasonable person would    approve.

487 U.S. at 565-66 (footnote omitted), citing United States v. Yoffe, 775 F.2d 447 (lst Cir. 1985);

Dubose v. Pierce, 761 F.2d 913 (2d Cir. 1985); Citizens Council of Delaware County v. Brine-gar,

741 F.2d 584 (3d Cir. 1984); Anderson v. Heckler, 756 F.2d 1011 (4th Cir. 1985); Hanover Building

Materials, Inc. v. Guif-frida, 748 F.2d 1011 (5th Cir. 1984); Trident Marine Construction, Inc. v.

District Engineer, 766 F.2d 974 (6th Cir. 1985); Ramos v. Haig, 716 F.2d 471 (7th Cir. 1983); Foster

v. Tourtel-lotte, 704 F.2d 1109 (9th Cir. 1983); United States v. 2,116 Boxes of Boned Beef, 726

F.2d 1481 (10th Cir.), cert. denied sub nom. Jarboe-Lackey Feedlots, Inc. v. United States, 469 U.S.

825 (1984); Ashburn v. United States, 740 F.2d 843 (11th Cir. 1984).  In Gavette, the Court of

Appeals for the Federal Circuit had opined that "substantial justification" requires that the

Government show that it was *clearly* reasonable in asserting its position . . . in view of the law

and the facts.  The Government must show that it has     not "persisted in pressing a tenuous factual or legal position, albeit one not wholly without foundation."  It is not sufficient for the Government to show mere- ly "the existence of a colorable legal basis for the government's case."

808 F.2d at 1467 (emphasis in original), citing <u>Schuenemeyer v</u>. <u>United States</u>, 776 F.2d 329 (Fed.Cir. 1985), and quoting <u>Gava</u>   v. <u>United States</u>, 699 F.2d 1367, 1375 (Fed.Cir. 1983).

Whatever the precise definition, given the facts and circumstances of this case, which obviously transcend purely domestic concerns, this court is unable to conclude that the government's position currently is not substantially justified.  As the Supreme Court noted in <u>Underwood</u>, 487 U.S. at 566, n. 2:

> . . . [A] position can be justified even though it    is not correct, and we believe it can be substantial- ly (<u>i.e.</u>, for the most part) justified if a reasonable person could think it correct, that is, if it has a reasonable basis in law and fact.

## III

The court's inability means not only that plaintiffs' application for any award of fees etc. cannot be granted, the motion for injunctive relief based upon the declaratory judgment in their favor must also be denied.  Clearly, the intent of sec-tion 609 is and has been to help prevent the extinction of sea turtles wherever they exist on Earth.  The government professes continuing commitment to this goal, consistent with both its na-

tional and other, *inter*national obligations. And the plaintiffs have not proven that this goal is being

drowned now by vessel-specific shipments of shrimp from Brazil (or any other uncertified nation).

Indeed, the overall record of this matter reflects that Brazil not only has a national regulatory program

governing the incidental taking of endangered turtle species during harvesting of shrimp in the wild that is

comparable to that of the United States, it has been duly certified to Congress under sec-tion

609(b)(2)(A) and (B) from time to time.[27]  To the extent that Brazil has not been so certified this year,

the reason given is "its inadequate enforcement of its TEDs rules in its southern fishery", to quote

Director Balton, supra.   Nevertheless, the best evidence the plaintiffs have produced is the report of

their Latin American Program Director Arauz viz. Sea Turtles of Brazil, p. 6 (June 1999):

> **Industrial Shrimping activities**. In the north and south-   ern fishing regions pink shrimp
> is targeted (Penaeus paulensi, P. Brasileinsi and P. Subtilis) at about      50 ms of depth.  In
> the Northeast and Southeast the  seven keel shrimp (Xiphopenaeus kroyeri) are captured.
> This fishery is carried out right in front of important nesting beaches.  According to
> interviews with fisher-men, after 1500 hours of shrimping activities, only two turtles were
> captured (CPUE = 0.0013/hour).  However, this figure is not reliable because captains
> deliber-

---

[27] See Slip Op. 99-32, 23 CIT __ and 48 F.Supp.2d at 1079,  n. 33.  Then again, unfortunately, it must be recognized that section 609 certification of certain countries following prior orders of the court, e.g., Costa Rica (Pacific fleet), is not proving to be a panacea for the worldwide problem.  See, e.g., Fountain, Sea Turtles Nearing Extinction in Pacific, Study Says, N.Y. Times, June 1, 2000, at A18 ("Fishing practices are blamed for sharp decline").

ately do not record sea turtle captures.  TEDs are re-quired by all shrimping vessels in
Brazil, but no con-trol exists, and fishermen in general are against the  use of this technol-
ogy . . ..

In spite of the fact that shrimping induced mortality is considered low and not important,
other Brazilian biologists are concerned about the fate of the olive ridleys that nest in the
state of Sergipe, the only nesting site for ridleys in Brazil. Shrimpers report-edly cause
death to nesting adult turtles.  . . .

This report, standing essentially on its own, hardly supports a permanent injunction against the

government of the United States.  Cf. Defenders of Wildlife v. Dalton, 24 CIT __, __, 97 F.Supp.2d

1197, 1200 (2000)("argument that irreparable injury is presum- ed in environmental cases is unavail-

ing"). As this court once was constrained to caution plaintiffs' counsel in their predecessor case, Earth

Island Institute v. Christopher, 19 CIT 1262, 1264 (1995), as well as lawyers from time time in other

actions, e.g., Avanti Products, Inc. v. United States, 16 CIT 453, 453-54 (1992); Telectronics Pacing

Systems, Inc. v. United States, 20 CIT 393, 394 (1996); Citrus World, Inc. v. United States, 21   CIT

1078, 1078 (1997), appeal dismissed, 185 F.3d 878 (Fed.Cir. 1998); Napp Systems, Inc. v. United

States, 22 CIT __, __,  Slip Op. 98-163, p. 3 (Dec. 14, 1998):

. . . [A] party plaintiff has a primary and independ-ent obligation to prosecute any
action brought by it   -- from the moment of commencement to the moment of final
resolution.  That primary responsibility never shifts to anyone else and entails the timely
taking    of all steps necessary for its fulfillment.

IV

In sum, while the plaintiffs have persuaded this court to grant declaratory relief, they

have not borne their burden with regard to any of the other relief for which they pray.  Final judgment

will enter accordingly.

Dated: New York, New York
       July 19, 2000


                                          _____
                                                      Judge

<u>J</u> U <u>D</u> <u>G</u> <u>M</u> <u>E</u> N <u>T</u>

UNITED STATES COURT OF INTERNATIONAL TRADE

Thomas J. Aquilino, Jr., Judge

- - - - - - - - - - - - - - - - - - -x

TURTLE ISLAND RESTORATION NETWORK <u>etc</u>. :
<u>et</u> <u>al</u>.,

                                           :

         Plaintiffs,

                                          :

        v.             Court No. 98-09-02818

                                          :

ROBERT L. MALLETT <u>etc</u>. <u>et</u> <u>al</u>.,     :

                   Defendants.  :

- - - - - - - - - - - - - - - - - - -x


        This case having been duly submitted for decision;   and the court, after due delibera-tion, having rendered deci- sions herein;  Now therefore, in conformity with said decisions, it is


        ORDERED, ADJUDGED and DECREED that defendants' deter- mination(s) to grant U.S. entry to shrimp or products from shrimp which have been harvested with trawls equipped with U.S.-compar-able Turtle Excluder Devices in waters of nations not duly cer-tified by the President to Congress pursuant to Pub. L. No. 101-162, §609, 103 Stat. 988, 1037-38, 16 U.S.C. §1537 note, are  violative of that statute on its face; and it is further


        ORDERED, ADJUDGED and DECREED that, except as afore-said, plaintiffs' prayer for judgment herein be, and it hereby  is, dismissed; and it is further

ORDERED that Plaintiffs' Application for Attorneys' Fees, Costs and Expenses be,

and it hereby is, denied.

Dated:  New York, New York
     July 19, 2000


                               _____
                                          Judge