284 F.3d 1282
 TURTLE ISLAND RESTORATION NETWORK, Todd Steiner, The American Society for the Prevention of Cruelty to Animals, The Humane Society of the United States, and The Sierra Club, Plaintiffs-Appellants,
v.
Donald L. EVANS, Secretary of Commerce, Colin L. Powell, Secretary of State, Paul H. O'Neill, Secretary of the Treasury, David B. Sandlaw, Assistant Secretary of State for the Bureau of Oceans and International Environmental and Scientific Affairs, Penelope D. Dalton, Assistant Administrator for Fisheries, National Marine Fisheries Service, and Alan P. Larson, Under Secretary of State for Economic, Business and Agricultural Affairs, Defendants-Cross Appellants, and
National Fisheries Institute, Inc., Defendant-Cross Appellant.
 No. 00-1569.
 No. 00-1581.
 No. 00-1582.
 United States Court of Appeals, Federal Circuit.
 DECIDED: March 21, 2002.
 
 Joshua R. Floum, Legal Strategies Group, of Emeryville, California, argued for plaintiffs-appellants. With him on the brief was Ariela F. St. Pierre.
 M. Alice Thurston, Attorney, Environment and Natural Resources Division, Appellate, Department of Justice, of Washington, DC, argued for defendants-cross appellants. With her on the brief were John C. Cruden, Deputy Assistant Attorney General; Jane P. Davenport, and Ellen J. Durkee, Attorneys, Wildlife & Marine Resources Section. Of counsel were David M. Cohen, Director; Lucius B. Lau, Jeffrey C. Dobbins, and Jean E. Williams, Attorneys; Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC. Also of counsel were Anne V. Liu, Attorney, National Oceanic & Atmosph. Administration; and Violanda Botet, Attorney Advisor, Department of State; Pamela B. Lawrence, Attorney, Department of Commerce, of Washington, DC. Eldon V.C. Greenberg, Attorney, Garvey Schubert, of Washington, DC, for National Fisheries Institute, Inc.
 Before NEWMAN, CLEVENGER, and SCHALL, Circuit Judges.
 CLEVENGER, Circuit Judge.
 
 
 1
 This case concerns the implementation of section 609(b) of Public Law 101-162, which prohibits the import of shrimp which have been harvested with fishing technology that may harm sea turtles. Despite having ruled that the government's regulations implementing section 609(b) were not in accordance with that statute, the Court of International Trade refused to enter an injunction directing the government to comply with the law. Plaintiffs, a coalition of environmental organizations and concerned citizens ("Turtle Island"), appeal the Court of International Trade's decision to withhold both an injunction and attorney fees under the Equal Access to Justice Act. Defendants, government officials charged with implementing section 609(b), cross-appeal the judgment of the Court of International Trade that their regulations violate the statute. We hold that the government's regulations are a permissible implementation of the statute and that Turtle Island is not entitled to injunctive relief or attorney fees.
 
 BACKGROUND
 
 2
 Since 1987, United States regulations have required that shrimp trawlers generally install turtle excluder devices ("TEDs") when operating in United States waters where sea turtles are to be found. 50 C.F.R. §§ 223.206, 223.207 (2001). Shrimpers sweep many other denizens of the sea ("bycatch") into their nets when they trawl for shrimp. But unlike fish or shrimp, sea turtles are reptiles and must breathe air. While sea turtles can remain submerged for up to 90 minutes at a time, trawl nets typically are deployed for periods longer than 90 minutes before being hauled up. Sea turtles will drown if they are caught in shrimp nets and held underwater for long periods of time. When fitted into trawl nets, TEDs prevent sea turtles from being retained in the nets— typically by means of a metal grid barring entry to the closed end of the net. The grid bars are spaced so as to let shrimp pass through the grid into the closed end of the net, but the much larger sea turtles cannot pass through and are instead directed out an "escape hatch" above or below the grid.
 
 
 3
 The domestic shrimp industry strongly opposed the imposition of TED requirements in United States waters. See, e.g., State of Louisiana, ex rel. Guste v. Verity, 853 F.2d 322 (5th Cir.1988). However, the case before us concerns not domestic regulations, but arises instead from nearly a decade's worth of litigation over the enforcement of a statute designed to impose TEDs on shrimping vessels of foreign nations: The Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1990, Pub.L. 101-162, Title VI, § 609, 103 Stat. 1037 (1989) (codified at 16 U.S.C. § 1537 note (2000)) ("section 609").
 
 
 4
 The full text of section 609 is as follows:
 
 
 5
 (a) The Secretary of State, in consultation with the Secretary of Commerce, shall, with respect to those species of sea turtles the conservation of which is the subject of regulations promulgated by the Secretary of Commerce on June 29, 1987 —
 
 
 6
 (1) initiate negotiations as soon as possible for the development of bilateral or multilateral agreements with other nations for the protection and conservation of such species of sea turtles;
 
 
 7
 (2) initiate negotiations as soon as possible with all foreign governments which are engaged in, or which have persons or companies engaged in, commercial fishing operations which, as determined by the Secretary of Commerce, may affect adversely such species of sea turtles, for the purpose of entering into bilateral and multilateral treaties with such countries to protect such species of sea turtles;
 
 
 8
 (3) encourage such other agreements to promote the purposes of this section with other nations for the protection of specific ocean and land regions which are of special significance to the health and stability of such species of sea turtles;
 
 
 9
 (4) initiate the amendment of any existing international treaty for the protection and conservation of such species of sea turtles to which the United States is a party in order to make such treaty consistent with the purposes and policies of this section; and
 
 
 10
 (5) provide to the Congress by not later than one year after the date of enactment of this section (Nov. 21, 1989) —
 
 
 11
 (A) a list of each nation which conducts commercial shrimp fishing operations within the geographic range of distribution of such sea turtles;
 
 
 12
 (B) a list of each nation which conducts commercial shrimp fishing operations which may affect adversely such species of sea turtles; and
 
 
 13
 (C) a full report on —
 
 
 14
 (i) the results of his efforts under this section; and
 
 
 15
 (ii) the status of measures taken by each nation listed pursuant to paragraph (A) or (B) to protect and conserve such sea turtles.
 
 
 16
 (b)(1) In General. — The importation of shrimp or products from shrimp which have been harvested with commercial fishing technology which may affect adversely such species of sea turtles shall be prohibited not later than May 1, 1991, except as provided in paragraph (2).
 
 
 17
 (2) Certification Procedure. — The ban on importation of shrimp or products from shrimp pursuant to paragraph (1) shall not apply if the President shall determine and certify to the Congress not later than May 1, 1991, and annually thereafter that —
 
 
 18
 (A) the government of the harvesting nation has provided documentary evidence of the adoption of a regulatory program governing the incidental taking of such sea turtles in the course of such harvesting that is comparable to that of the United States; and
 
 
 19
 (B) the average rate of that incidental taking by the vessels of the harvesting nation is comparable to the average rate of incidental taking of sea turtles by United States vessels in the course of such harvesting; or
 
 
 20
 (C) the particular fishing environment of the harvesting nation does not pose a threat of the incidental taking of such sea turtles in the course of such harvesting.
 
 
 21
 Section 609 is divided into two parts, (a) and (b). Part (a) directs the Secretary of State to initiate international negotiations with the aim of protecting those species of sea turtles protected by the domestic TED requirements.[1] Part (b)(1) restricts the importation of shrimp which have been harvested in a manner that may endanger those species of sea turtles. Part (b)(2) establishes a certification procedure,[2] by which nations are exempted from the ban either if they have adopted regulatory measures reducing the incidental catch of sea turtles (e.g., a requirement that their shrimp fleets be equipped with TEDs), or if their operations do not pose any threat to sea turtles (e.g., no endangered turtles inhabit the waters fished by that nation).
 
 
 22
 This case requires us to decide whether section 609(b)(2)'s certification procedure is the only way a foreign nation may comply with section 609(b). Under the State Department's current regulations (Revised Guidelines for the Implementation of Section 609 of Public Law 101-162 Relating to the Protection of Sea Turtles in Shrimp Trawl Fishing Operations, 64 Fed.Reg. 36,946 (July 8, 1999) ("the 1999 Guidelines")), shrimp may be imported into the United States under one of two conditions. If the exporter attests that the nation in which the shrimp originated (that is, in whose waters the shrimp were harvested) has been certified under section 609(b)(2), the shrimp may be imported without further ado. Alternatively, if the country of origin has not been certified under section 609(b)(2), shrimp harvested in its waters may still enter the United States if both the exporter and an official of the harvesting nation attest that the individual shipment of shrimp in question was harvested under conditions that do not adversely affect sea turtles. Shipments meeting these conditions include those of aquaculture-grown shrimp, hand-caught shrimp, and shrimp harvested by vessels equipped with TEDs.[3] Thus, under the government's interpretation of section 609, a country may export shrimp to the United States either by requiring its entire fleet to be equipped with TEDs (and becoming certified under section 609(b)(2)), or by requiring TEDs only on those vessels catching shrimp destined for the United States market.[4]
 
 
 23
 Turtle Island interprets section 609 somewhat differently. Turtle Island believes that section 609 requires the government to prohibit the importation of all shrimp from uncertified countries. Under Turtle Island's interpretation of the statute, certification is the only way in which shrimp may be imported into the United States. In practice, this means that in countries where shrimp and endangered sea turtles frequent the same waters, all shrimping vessels must be equipped with TEDs if that country wishes to export shrimp to the United States.[5] Turtle Island argues that this interpretation is mandated by the plain language, intent, and legislative history of the statute.
 
 
 24
 The contest between Turtle Island and the government over the interpretation of section 609 has a long and tortured history, chiefly marked by the government's Protean efforts to escape the statutory interpretations being imposed upon it by the Court of International Trade. In the government's initial implementation of section 609 (the 1991 and 1993 Guidelines), the embargo was imposed only against shrimp from the Gulf of Mexico Caribbean Western Atlantic Ocean sea areas, harvests in those areas being the apparent focus of section 609 when the statute was enacted. See Revised Guidelines for Determining Comparability of Foreign Programs for the Protection of Turtles in Shrimp Trawl Fishing Operations, 58 Fed.Reg. 9015 (Feb. 18, 1993); Turtles in Shrimp Trawl Fishing Operations Protection; Guidelines, 56 Fed.Reg. 1051 (Jan. 10, 1991). But under the 1991 and 1993 Guidelines, national certification under section 609(b)(2) was the only way a harvesting nation could export shrimp to the United States. The import of shrimp from uncertified countries was prohibited, even if those particular shrimp had been caught using TEDs.
 
 
 25
 In 1992, the Earth Island Institute, a nonprofit environmental group and Turtle Island's immediate predecessor, filed suit against the government in the Northern District of California. Earth Island sought to force the government to initiate negotiation of international agreements for sea turtle conservation as demanded by section 609(a), and sought to force the government to apply the embargo against all shrimp-exporting countries, not just those of the wider Caribbean area. Earth Island was rebuffed on both fronts. The Ninth Circuit refused to enforce the negotiation directives of section 609(a), reasoning that since the power to negotiate with foreign nations was committed to the executive branch, enforcement of section 609(a) would violate the constitutional separation of powers. Earth Island Inst. v. Christopher, 6 F.3d 648, 653 (9th Cir.1993). Furthermore, the Ninth Circuit ruled that because 28 U.S.C. § 1581(i) vests exclusive jurisdiction over embargoes and other trade restrictions in the Court of International Trade, an action to compel enforcement of the import prohibitions of section 609(b) could lie only with that court. Id. at 652.
 
 
 26
 Earth Island proceeded to refile its suit in the Court of International Trade, seeking to force the government to apply section 609(b)'s import restrictions worldwide, not just against shrimp harvested in the wider Caribbean region. The Court of International Trade agreed with Earth Island that the embargo should be applied across the board. The Court of International Trade also made clear its view that the government had limited enforcement of section 609(b) to the Caribbean region not because the government genuinely believed the statute to be so limited, but because of the economic and political fallout that would ensue from targeting countries outside the wider Caribbean. See Earth Island Inst. v. Christopher, 913 F.Supp. 559, 576-77 (Ct. Int'l Trade 1995). Finding no geographical restrictions in the text of section 609, the Court of International Trade concluded that the government had not been properly enforcing section 609(b) and directed the government to prohibit the importation of shrimp — "wherever harvested in the wild" — that were harvested with commercial fishing technology that may adversely affect the species of sea turtles protected by section 609. Id. at 580.
 
 
 27
 In response to the Court of International Trade's decision (and following the Court of International Trade's refusal to grant a one-year extension of time for enforcement, Earth Island Inst. v. Christopher, 922 F.Supp. 616 (Ct. Int'l Trade 1996)), the Department of State issued new regulations implementing section 609(b). Revised Notice of Guidelines for Determining Comparability of Foreign Programs for the Protection of Turtles in Shrimp Trawl Fishing Operations, 61 Fed.Reg. 17,342 (April 19, 1996). Complying with the Court of International Trade's order in Earth Island, the 1996 Guidelines restricted imports of shrimp harvested from all waters inhabited by sea turtles, not just those of the wider Caribbean region. However, in contrast to the 1991 and 1993 Guidelines, the 1996 Guidelines permitted imports of shrimp from waters of uncertified nations-so long as the exporter presented a declaration (the DSP 12 form) attesting that the shrimp accompanying the declaration were harvested under conditions that did not adversely affect the protected species of sea turtles. Thus, under the 1996 Guidelines, a nation did not need to be certified under section 609(b)(2) in order to export shrimp to the United States. Instead, a nation could comply with section 609 simply by employing TEDs on those vessels harvesting shrimp bound for the United States market.
 
 
 28
 Earth Island was less than pleased with the government's new interpretation of section 609. It filed with the Court of International Trade a "motion to enforce" the Court of International Trade's 1995 judgment, on the grounds that permitting import of TED — caught shrimp from uncertified nations would not conform with the Court of International Trade's 1995 order directing the State Department to implement section 609 world-wide.
 
 
 29
 The Court of International Trade agreed with Earth Island that section 609(b)(1)'s embargo should be applied on a nation-by-nation basis, rather than on a shipment-by-shipment basis. The Court of International Trade's interpretation of section 609 rested on two grounds. First, the Court of International Trade refused to read the language of section 609(b)(1) in isolation. Reasoning that section 609(a) directed the Secretary of State to pursue negotiations with foreign nations, and that section 609(b)(2) required the President to determine whether a foreign nation's regulatory programs met United States standards for protection of sea turtles, the Court of International Trade concluded that section 609(b)(2) should be read in pari materia with the other sections of section 609. As such, the import restrictions of section 609(b)(2) should be applied nation-by-nation, and not shipment-by-shipment. Earth Island Inst. v. Christopher, 942 F.Supp. 597, 603-04 (Ct. Int'l Trade 1996).
 
 
 30
 The Court of International Trade's second rationale was based on its earlier conclusion that section 609 supplemented the Endangered Species Act ("ESA") and should also be read in pari materia with the ESA. Earth Island Inst. v. Christopher, 890 F.Supp. 1085, 1092 (Ct. Int'l Trade 1995). The Court of International Trade took from the ESA the principle that "the plain intent of Congress in enacting this statute was to halt and reverse the trend towards species extinction, whatever the costs." Earth Island, 942 F.Supp. at 606 (quoting Earth Island, 913 F.Supp. at 576, in turn quoting Tenn. Valley Auth. v. Hill, 437 U.S. 153, 184, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978)). Accepting (in the absence of contrary evidence from the government) Earth Island's claim that the shipment-by-shipment approach would undermine the incentive for uncertified nations to become certified, the Court of International Trade agreed with Earth Island that the 1996 Guidelines would "eviscerat[e] the goal of Congress in enacting section 609." Earth Island, 942 F.Supp. at 604. Accordingly, the Court of International Trade prohibited the government from permitting the import of shrimp unless the harvesting nation had been certified under section 609(b)(2). Id. at 617.
 
 
 31
 There followed another ruling from the Court of International Trade, denying the government's request for a stay of enforcement but clarifying that the embargo did not apply to aquacultured shrimp or hand-caught shrimp, as these fishing technologies would not adversely affect sea turtles and were exempted from section 609 from the start. Earth Island Inst. v. Christopher, 948 F.Supp. 1062, 1069 (Ct. Int'l Trade 1996). However, Earth Island had sought to withdraw its "motion to enforce" shortly before the Court of International Trade issued its first ruling on the 1996 Guidelines, leaving only its request for attorney fees before the Court of International Trade. Earth Island, 942 F.Supp. at 602 n. 7. The stated purpose of its attempted withdrawal was to preserve Earth Island's right to gather additional evidence and to challenge the government's revised guidelines in a separate action.[6] Id.; Earth Island Inst. v. Albright, 147 F.3d 1352, 1355 (Fed.Cir.1998). The Court of International Trade denied Earth Island permission to withdraw, basing its refusal on the public interest at stake in proper enforcement of section 609. Earth Island, 942 F.Supp. at 602 n. 7.
 
 
 32
 Upon the government's appeal to this court, we held that Earth Island "did not request permission to withdraw, but unilaterally and unconditionally withdrew its motion." Earth Island, 147 F.3d at 1356. We further held that Earth Island's unconditional withdrawal ended the controversy between the parties, thereby terminating the Court of International Trade's jurisdiction over the case except for the matter of attorney fees. Id. Accordingly, we vacated the Court of International Trade's orders that had directed the State Department to enforce section 609 on a nation-by-nation basis. Id. at 1358.
 
 
 33
 Meanwhile, during the period that the Court of International Trade had enjoined the government from permitting the import of TED-caught shrimp from uncertified nations, a group of such nations — India, Pakistan, Malaysia, and Thailand — brought a proceeding against the United States before the Dispute Settlement Body of the World Trade Organization ("WTO"), arguing that the enforcement of section 609 under the 1996 Guidelines violated certain provisions of the 1994 General Agreement on Tariffs and Trade ("GATT"). Ultimately, the WTO Appellate Body ruled that section 609 was a permissible conservation measure under GATT Article XX, but that the United States' enforcement of section 609 was discriminatory. United States — Import Prohibition of Certain Shrimp and Shrimp Products, 1998 WL 720123 (Oct. 12, 1998). Specifically, the WTO pointed to the fact that shrimp caught using methods identical to those employed in the United States (i.e., with TEDs) were embargoed solely because they were caught in the waters of uncertified countries. Id. at *47. And while the statute itself might permit a flexible approach, the 1996 Guidelines demanded that a country adopt a regulatory regime identical to that of the United States as the only path to certification. Id. at *46. Furthermore, the failure of the United States to initiate serious international negotiations to protect sea turtles (as demanded by section 609(a)) supported a finding of unjustifiable discrimination. Id. at *51.
 
 
 34
 After this court vacated the Court of International Trade's injunction against the government, the State Department issued new Guidelines reinstating importation of shrimp from uncertified countries. Revised Notice of Guidelines for Determining Comparability of Foreign Programs for the Protection of Sea Turtles in Shrimp Trawl Fishing Operations, 63 Fed.Reg. 46,094 (Aug. 28, 1998). Like the 1996 Guidelines, the 1998 Guidelines permitted import of shrimp from uncertified countries if the shipment was accompanied by a DSP 12 form attesting that the shrimp had been harvested by vessels equipped with TEDs. Its earlier victory having been negated for lack of jurisdiction, Earth Island again filed suit challenging the new regulations in the Court of International Trade, which (not surprisingly) again found that importation of shrimp from uncertified countries violated the provisions of section 609(b). Earth Island Inst. v. Daley, 48 F.Supp.2d 1064, 1081 (Ct. Int'l Trade 1999). Soon afterwards, the State Department issued its 1999 Guidelines. Designed to meet the WTO's objections, the 1999 Guidelines took a more flexible stance on which regulatory programs would merit national certification, but the 1999 Guidelines continued to permit importation of TED-caught shrimp from uncertified countries. Accordingly, the Court of International Trade yet again held that the shipment-by-shipment approach violated section 609 and entered a final declaratory judgment in favor of Turtle Island—which by now had been spun off as an independent entity from the Earth Island Institute. Turtle Island Restoration Network v. Mallett, 110 F.Supp.2d 1005, 1018 (Ct. Int'l Trade 2000).
 
 
 35
 However, although the Court of International Trade concluded "without reservation that the plaintiffs have prevailed" in their argument that the importation of TED-caught shrimp from uncertified nations violated the terms of section 609, id., the Court of International Trade denied Turtle Island injunctive relief. Moreover, the Court of International Trade refused to hold that the government's legal position was not substantially justified, barring Turtle Island from collecting attorney fees under the Equal Access to Justice Act. The Court of International Trade appeared to base these conclusions on the fact that of all the countries exporting shrimp to the United States, only Brazil and Australia were not certified, suggesting that relatively few sea turtles were being harmed in the waters of uncertified nations that served the United States shrimp market. Id. at 1011-12. Moreover, no nation that had previously established a nation-wide TED program had limited its regulatory program in favor of equipping only those vessels that served the United States market with TEDs. Id. at 1013. Given the absence of proof that shrimp trawling by uncertified nations was currently contributing significantly to sea turtle mortality, and in apparent recognition of the traditional reluctance of courts to intrude into matters of foreign relations, the Court of International Trade concluded, somewhat cryptically:
 
 
 36
 given the facts and circumstances of this case, which obviously transcend purely domestic concerns, this court is unable to conclude that the government's position currently is not substantially justified....
 
 
 37
 The court's inability means not only that plaintiff's application for any award of fees etc. cannot be granted, the motion for injunctive relief based upon the declaratory judgment in their favor must also be denied.
 
 
 38
 
 Id.
 
 
 
 39
 After the Court of International Trade issued its final judgment in Turtle Island Restoration Network v. Mallett, Malaysia renewed its challenge to the United States over enforcement of section 609 before a panel of the Dispute Settlement Body of the World Trade Organization. However, the panel ruled, and the Appellate Body affirmed, that the enforcement of section 609 under the State Department's 1999 Guidelines was justified under Article XX of GATT. These conclusions were based in part on the Court of International Trade's refusal to grant Turtle Island an injunction against the government, since under that ruling the United States continued to permit the import of TED-caught shrimp from uncertified countries. United States — Import Prohibition of Certain Shrimp and Shrimp Products, 2001 WL 671012, at *101 (Jun. 15, 2001). Moreover, the United States had initiated serious international negotiations for sea turtle protection, and now required nations to establish for certification a sea turtle program comparable in effectiveness to that of the United States — not necessarily one identical to that of the United States. United States — Import Prohibition of Certain Shrimp and Shrimp Products, 2001 WL 126572, at *38-49; *51-54 (Oct. 22, 2001). Consequently, the enforcement of section 609 was ruled a permissible conservation measure and not discriminatory under Article XX of GATT.
 
 
 40
 Turtle Island now appeals the Court of International Trade's denial of an injunction and attorney fees. The government appeals the judgment of the Court of International Trade that the importation of TED-caught shrimp from uncertified countries as permitted by the 1999 Guidelines violates section 609. We exercise appellate jurisdiction over the final decision of the Court of International Trade under 28 U.S.C. § 1295(a)(5).
 
 
 41
 * We first consider whether the Court of International Trade reached the proper construction of section 609, as the propriety of the Court of International Trade's denial of injunctive relief and attorney fees will hinge on whether Turtle Island or the government has advocated the appropriate interpretation of the statute. We must therefore decide whether section 609(b)(1) of Pub.L. 101-162 prohibits importation of all shrimp or shrimp products from a country not certified under section 609(b)(2), or whether the government may permit the import of individual shipments from uncertified countries if exporters represent that those particular shipments were caught without the use of commercial fishing technology that may adversely affect those species of sea turtles protected by domestic law. Statutory interpretation is a matter of law that we review without deference to the interpretation reached by the Court of International Trade. SKF USA Inc. v. United States, 263 F.3d 1369, 1378 (Fed.Cir.2001).
 
 
 42
 * We begin, as in all questions of statutory interpretation, with the plain words of the law, and in this case those words weigh heavily in the government's favor. The operative language of the embargo is found in section (b)(1), which prohibits importation of shrimp, "which have been harvested with commercial fishing technology" that may harm sea turtles, except as provided in (b)(2). The clause "which have been harvested" modifies "shrimp." "Shrimp" are discrete objects, each of which has either been harvested with technology harmful to sea turtles or not. The statute distinguishes between the former shrimp, which are embargoed, and the latter shrimp, which are not. The plain language of the statute provides no basis for embargoing shipments of shrimp which have not been harvested with commercial fishing technology that may harm sea turtles. Because TED-caught shrimp have not been harvested with commercial fishing technology that may harm sea turtles, the statutory language does not support embargoing TED-caught shrimp from uncertified countries. Moreover, if certification under (b)(2) was the only way shrimp could be imported into the United States, then "which have been harvested with commercial fishing technology which may affect adversely such species of sea turtles" in (b)(1) is largely superfluous language. We cannot see how the "harvested with commercial fishing technology" language could consistently be interpreted to permit import of some shrimp that have been harvested without adverse effect on sea turtles — such as aquacultured or hand-caught shrimp from uncertified countries — but to ban the import of other shrimp that have been harvested without adverse effect on sea turtles — such as TED-caught shrimp from uncertified countries.
 
 
 43
 Recognizing the primacy of the plain language in the hierarchy of statutory interpretation, Turtle Island tries to advance several arguments under that rubric. It argues that its interpretation is consistent with congressional intent, with other portions of the statute, and with the law's ultimate purpose — all of which might be true but none of which states an argument based on the plain language of the statute. Turtle Island cannot escape the fact that it seeks to interpolate words into the plain language of the statute, reading 609(b)(1) as an embargo on "shrimp which have been harvested from a nation that employs commercial fishing technology which may affect adversely said species of sea turtles." While the text might not absolutely bar such an interpolation, this interpretation does not comport with the most direct reading of the law's words.
 
 
 44
 In any event, we do not find persuasive the argument based on conformity with the remaining sections of section 609. Turtle Island points to section 609(a), which directs the Secretary of State to negotiate with foreign nations to protect sea turtles, and to section 609(b)(2), which establishes a procedure for nations to be certified as exempt from the embargo of section 609(b)(1). The Court of International Trade drew from this structure the conclusion that, reading those sections of the law in pari materia with the embargo provisions, the embargo provisions must refer to other nations, and not to individual shipments of shrimp. Earth Island, 942 F.Supp. at 603-604. We cannot agree with this reasoning. The fact that other portions of the statute direct the Secretary of State to negotiate with and certify nations does not demand that the Secretary apply the embargo to entire nations as well. One negotiates with nations and imports shrimp, not vice versa. Congress drafted sections 609(a) and 609(b)(2) to refer to nations because the negotiation and certification provisions could not have been drafted in any other way — not because Congress made a conscious choice to focus them on nations rather than shipments. An embargo provision, on the other hand, might be drafted either to apply to shipments or to nations, and we do not think Congress was foreclosed from embargoing individual shipments of shrimp simply because it included the embargo provisions in a law that also speaks of nations. We find nothing inherently insensible about applying the negotiation and certification provisions to nations on the one hand, and the embargo provisions to particular shipments of shrimp on the other.
 
 B
 
 45
 Both sides also lay claim to the legislative history of section 609. The State Department finds some congressional intent to delegate the definition of which shrimp should be embargoed, while Turtle Island finds both the nation-by-nation principle and the conclusion that section 609's principal goal is the protection of endangered sea turtle species worldwide. We cannot find support for the State Department's position. While Congress may have intended the administering agency to define which methods of harvesting shrimp may adversely affect sea turtles, we find no intent to delegate the power to define the scope of the embargo itself. But our disagreement with Turtle Island's view of the legislative history is more profound and more damaging to its case. For we find nothing in the legislative history to mandate a nation-by-nation approach, and we find little, if any, indication that minimizing sea turtle drownings was Congress's main concern when it enacted section 609.
 
 
 46
 The extant legislative history of section 609 consists mostly of speeches on the Senate floor. Turtle Island emphasizes portions of this record in which Senators speak of "other nations" and "countries" to support its position that section 609(b)(1) was intended to operate nation-by-nation. We are not inclined to assign much weight to these excerpts. Although the Senators spoke more in terms of nations than of shipments or vessels, their usage was not consistent. For example, Appropriation Chairman Hollings described the provision when brought to the Senate floor as:
 
 
 47
 It calls for a ban on imports of shrimp from any nation that: First, fails to adopt a regulatory program for turtle protection which is comparable to that of the United States; and second, has higher incidental catches of sea turtles than U.S. shrimpers.
 
 
 48
 135 Cong. Rec. 22,493-94 (1989) (emphasis added), but described the final version after conference with the House as follows:
 
 
 49
 At the request of the House managers we approved an addition on the ban on imported shrimp not harvested by vessels using TED's shall not apply [sic] if the "particular fishing environment of the harvesting nation does not pose a threat of the incidental taking of such sea turtles in the course of such harvesting."
 
 
 50
 135 Cong. Rec. 26,613 (1989) (emphasis added). The relevant provisions of the bill had not changed; Senator Hollings's shift simply indicates how loosely Senators described the bill. Given the imprecision and informality of the floor comments, we are loath to assemble congressional intent from such scraps of casual word choice.
 
 
 51
 Furthermore, most of the comments marshaled by Turtle Island do not reflect the Senate's interpretation of the embargo provisions of section 609(b)(1), because those comments were made in support of a bill that lacked any embargo provisions at all. As first introduced by Senator Breaux, "Amendment No. 365" included only the provisions now appearing as 609(a), requiring the Secretary to initiate negotiations for international sea turtle conservation and to report on other nations' efforts to protect sea turtles. See 135 Cong. Rec. 15,508 (1989). Apparently, an earlier measure had included some kind of embargo, but that measure was never brought to the floor because the Senate Finance Committee feared that such an embargo might violate the GATT. See id. at 15,509 (statements of Sens. Bentsen and Lott). The floor statements in support of the original bill refer to "other nations" and "countries" because international negotiations were the sole focus of the original bill. While the supporters of the original bill clearly hoped to induce foreign nations to adopt TED requirements, we cannot derive from their description of the negotiation provisions a nation-by-nation approach to the embargo.
 
 
 52
 The original "Amendment No. 365" was not brought to a vote, but soon resurfaced as a measure including the embargo provisions of 609(b) as well as the negotiation provisions of 609(a). We have no indication why the new embargo provisions did not provoke concerns about GATT violations. But what is unmistakably clear from the discussion on the Senate floor is that the primary purpose of the bill was to protect the domestic shrimping industry, and not the sea turtle. The advocates of the bill were Senators from Gulf states who had long opposed the domestic TED regulations because they believed that TEDs reduced shrimp catches. See 135 Cong. Rec. 22,554-55 (1989) (statements of Sens. Johnston and Breaux). The Senators who spoke in favor (none spoke against) feared that American shrimpers would be at a disadvantage competing in the domestic market with foreign shrimpers, who were not burdened with TED regulations. By imposing TED requirements on foreign shrimpers exporting to the United States, the sponsors of section 609 hoped to provide American shrimpers with a level playing field. Senator Shelby's comments in support of the original version of the bill (lacking the embargo provisions) explain this reasoning well:
 
 
 53
 Shrimpers are having numerous problems in using the TED's. It is my understanding that the Gulf of Mexico has been overwhelmed with seagrass in recent months causing the clogging of the openings of the TED's. Consequently, shrimpers are losing considerable amounts of their catch, which translates into reductions in income. There has been little evidence to date to indicate that the use of TED's will significantly affect the survival rate of sea turtles.... The U.S. shrimp industry is being treated unfairly in being asked to risk economic ruin while others are not required to do similarly. The burden of saving the sea turtles should be shared equally.... In addition, other countries have extensive commercial shrimp operations that are not subjected to turtle conservation. This places our shrimp industry in a noncompetitive situation because these countries still share the lucrative U.S. market with our domestic shrimpers. Our domestic shrimpers must have a level playing field.
 
 
 54
 135 Cong. Rec. 15,511 (1989).
 
 
 55
 Similar arguments were advanced by Senators Bentsen, id. at 15,509, Lott, id. at 15,509-10, Breaux, id. at 15,508-09, and Johnston, 135 Cong. Rec. 22,554 (1989). Each expressed his concern that the domestic shrimp industry was threatened because U.S. shrimpers, bearing the alleged increased costs of TEDs, would have to compete with foreign shrimpers not so burdened. By requiring or encouraging other nations to catch shrimp bound for the United States market with TEDs, imported shrimp would cost more and be less competitive with domestic shrimp. Alternatively, if foreign shrimp was embargoed, the price of shrimp would rise, also benefiting the domestic shrimp industry. Id. (statement of Sen. Johnston).
 
 
 56
 Thus, to the extent legislative history is available, we find that Congress with remarkable unanimity was focused on protecting the domestic shrimp industry, not the sea turtle, when it enacted section 609. Many of the comments made on the Senate floor reflected deep skepticism about the effectiveness of TED requirements, and about the wisdom of placing sea turtle conservation above the economic well-being of domestic shrimpers. We therefore cannot agree with Turtle Island that the fidelity of the government's implementation of section 609 should be measured solely by how effectively the measures protect endangered sea turtles.
 
 
 57
 Nor can we agree with Turtle Island that requiring foreign nations to install TEDs on vessels not serving the United States market would advance Congress's aim of achieving parity for the domestic shrimp industry. Congress did not seem to foresee that a nation might equip vessels serving the United States market with TEDs but forego TEDs on its other vessels. Turtle Island argues that requiring such nations to equip their entire fleets with TEDs would benefit the United States shrimp industry, because it would place domestic shrimpers exporting shrimp to overseas markets on an equal footing with foreign shrimpers exporting shrimp to the same markets. But coursing through the legislative history is an unswerving focus on the United States market, not overseas markets. There is no indication from the legislative history, and no evidence in the record, that domestic shrimpers compete in foreign markets.
 
 
 58
 Whether or not Congress was correct that the domestic TED requirements handicapped domestic shrimpers, Congress was concerned with the effects of TEDs on the United States market alone. Congress enacted a measure applicable to only those sea turtles encountered by American shrimpers,[7] and Congress enacted the embargo to protect what it saw as unfair competition in the American market. As such, Congress was concerned with those foreign vessels harvesting shrimp for the United States market, not foreign vessels harvesting shrimp for foreign markets. We find Congress's intent met by the State Department's current system of enforcing section 609(b), which regulates all imports of shrimp into the United States market. The contemporary legislative history provides no basis for extending section 609(b)'s reach in an attempt to control how shrimp bound for foreign markets are harvested.
 
 C
 
 59
 We find further indication that section 609(b)(1) refers to shipments, not nations, when we compare it to similar statutes.[8] Congress has drafted other statutes with explicit nation-by-nation embargoes, but did not do so in the case of section 609(b). Congress has enacted nation-by-nation embargoes triggered by foreign restrictions on fishing rights of U.S. vessels:
 
 
 60
 the Secretary of the Treasury shall immediately take such action as may be necessary and appropriate to prohibit the importation into the United States... fish or fish products, from any fishery of the foreign nation concerned, which the Secretary of State finds to be appropriate....
 
 
 61
 16 U.S.C. § 1825(b)(2) (2000) (emphasis added); by nations conducting large-scale driftnet fishing outside their exclusive economic zones:
 
 
 62
 The President ... shall direct the Secretary of the Treasury to prohibit the importation into the United States of fish and fish products ... from that nation.
 
 
 63
 16 U.S.C. § 1826a(b)(3)(A) (2000) (emphasis added); and by fishing operations or other trade threatening endangered species:
 
 
 64
 the President may direct the Secretary of the Treasury to prohibit the bringing or the importation into the United States of any products from the offending country for any duration as the President determines appropriate and to the extent that such prohibition is sanctioned by the World Trade Organization....
 
 
 65
 22 U.S.C. § 1978(a)(4) (Supp. V 1999) (emphasis added).
 
 
 66
 When Congress omits from a statute a provision found in similar statutes, the omission is typically thought deliberate. See, e.g., I.N.S. v. Phinpathya, 464 U.S. 183, 190, 104 S.Ct. 584, 78 L.Ed.2d 401 (1984). In very similar instances, Congress has explicitly embargoed all imports from the offending nation, regardless of whether any particular shipment was taken in a manner that would threaten endangered species. The fact that Congress declined to include such language in section 609(b) suggests that Congress did not intend to impose a similar embargo there.
 
 D
 
 67
 Turtle Island also argues that allowing an exporting nation to equip only those vessels serving the United States market will undo the ends of section 609, since those turtles escaping from the TED-equipped trawl nets "inevitably will die" in the nets of other vessels trawling the same waters that are not equipped with TEDs. As we state above, section 609 was not enacted with the primary goal of minimizing sea turtle deaths. But as a matter of pure logic, we cannot agree with Turtle Island's predictions. Assuming sea turtles obey the laws of terrestrial probability, then a fleet partially equipped with TEDs will kill fewer sea turtles than a comparable fleet without any TEDs (so long as there are a finite number of trawling vessels and some sea turtles survive[9]). A fleet fully equipped with TEDs would likely save more turtles, but equipping only a portion of a fleet with TEDs is not entirely futile. Moreover, if Turtle Island's view is correct, then permitting the import of aquacultured or hand-caught shrimp from uncertified nations may also frustrate the purpose of section 609-because nations may export such shrimp to the United States but still harvest shrimp bound for other markets with trawl nets lacking TEDs.
 
 
 68
 Turtle Island also argues that permitting uncertified nations to export shrimp to the United States will lower the incentive for uncertified nations to become certified. But even if we thought that Turtle Island's approach would encourage more nations to enact certification programs, or save more sea turtles, we cannot give weight to such considerations if the will of Congress is dispositive. To quote Turtle Island's own argument, a court's "individual appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress" simply is not relevant; "[o]nce the meaning of an enactment is discerned ... the judicial process comes to an end." Tenn. Valley Auth. v. Hill, 437 U.S. 153, 194, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). Because we find that the combination of plain language, legislative history, and comparison with other statutory provisions decisively establishes the meaning of section 609(b), we need not consider more attenuated arguments on the wisdom of the government's implementation of section 609.
 
 
 69
 Likewise, because the meaning of section 609 is clear, we need not reach the question of how much deference we ought to accord the State Department's interpretation of section 609, or whether the State Department's interpretation would minimize potential conflicts with international trade agreements. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The intent of Congress is clear and the government's current implementation of section 609(b) carries out that intent.
 
 CONCLUSION
 
 70
 However much we may respect Turtle Island's long struggle on behalf of the Earth's endangered sea turtles, we cannot find that Congress shared Turtle Island's current position when it enacted section 609 of Pub.L. 101-162. Having concluded that the State Department's interpretation of section 609 is the correct one, we must also hold both that Turtle Island is not entitled to an injunction, and that the government's legal position was substantially justified within the meaning of the Equal Access to Justice Act. We therefore reverse the Court of International Trade's judgment that the government's decision to permit the importation of TED-caught shrimp from uncertified nations is not in accordance with section 609(b) of Pub.L. 101-162, and affirm the Court of International Trade's denial of injunctive relief and attorney fees.
 
 COSTS
 
 71
 No costs.
 
 REVERSED-IN-PART AND AFFIRMED-IN-PART
 
 
 Notes:
 
 
 [1]
 These species are the loggerhead (Caretta caretta), Kemp's ridley (Lepidochelys kempi), green (Chelonia mydas), leatherback (Dermochelys coriacea) and hawksbill (Erermochelys imbricata).
 
 
 [2]
 The President has delegated his authority to certify nations under 609(b)(2) to the Secretary of StateDelegation of Authority Regarding Certification of Countries Exporting Shrimp to the United States, 56 Fed.Reg. 357 (Jan. 4, 1991).
 
 
 [3]
 Each shipment must be accompanied by a "DSP 12" form, which attests either that the shipment was harvested in the waters of a certified country or that the shipment was harvested by one of the permissible methods
 
 
 [4]
 In practice, TED-equipped vessels and non-TED-equipped vessels do not seem to fish side by side in the waters of uncertified countries. Currently, uncertified countries that export shrimp to the United States enforce TED requirements on vessels plying certain fisheries but not in other fisheriesTurtle Island Restoration Network v. Mallett, 110 F.Supp.2d 1005, 1011-13 (Ct. Int'l Trade 2000).
 
 
 [5]
 Turtle Island apparently does not object to permitting import of aquacultured shrimp or hand-caught shrimp from uncertified countries
 
 
 [6]
 Apparently, Earth Island lacked confidence that its challenge to the 1996 Guidelines could be resolved in its favor on the basis of the evidence in record. The decision of the Court of International Trade proved those fears groundless
 
 
 [7]
 Section 609(a) specifies "those species of sea turtles the conservation of which is the subject of regulations promulgated by the Secretary of Commerce on June 29, 1987" — that is, the domestic TED regulations
 
 
 [8]
 We note in passing that section 609(b)(1) seems clearly patterned after the text of the Marine Mammal Protection Act of 1972, 16 U.S.C. § 1371(a)(2), as that statute stood when section 609 was enacted in 1989. However, neither party submitted an argument in their briefs based on this resemblance
 
 
 [9]
 If the depredations of that portion of the fleet not equipped with TEDs were so great as to drown all the turtles in the area, then both fleets would drown the same number of turtles-that is, all of them. However, not even Turtle Island makes such an allegation
 
 
 
 72
 PAULINE NEWMAN, Circuit Judge, dissenting.
 
 
 73
 I respectfully dissent, for the majority's decision negates the statutory method of protecting endangered sea turtles. The Court of International Trade applied the statute in accordance with its terms. Whatever the political or diplomatic considerations, neither the executive agency charged with administering the statute, nor this court, has authority to depart from the statute as enacted.
 
 
 74
 The Court of International Trade held that the State Department's 1998 Revised Guidelines[1] are not consistent with the authorizing statute, section 609 of Public Law 101-162, enacted in 1989 for the protection of endangered sea turtles. The relevant statutory provisions are: § 609(b)(1) In general. — The importation of shrimp or products from shrimp which have been harvested with commercial fishing technology which may affect adversely such species of sea turtles shall be prohibited not later than May 1, 1991, except as provided in paragraph (2).
 
 
 75
 § 609(b)(2) Certification procedure. — The ban on importation of shrimp or products from shrimp pursuant to paragraph (1) shall not apply if the President shall determine and certify to the Congress not later than May 1, 1991, and annually thereafter that —
 
 
 76
 (A) the government of the harvesting nation has provided documentary evidence of the adoption of a regulatory program governing the incidental taking of such sea turtles in the course of such harvesting that is comparable to that of the United States; and
 
 
 77
 (B) the average rate of that incidental taking by the vessels of the harvesting nation is comparable to the average rate of incidental taking of sea turtles by United States vessels in the course of such harvesting; or
 
 
 78
 (C) the particular fishing environment of the harvesting nation does not pose a threat of the incidental taking of such sea turtles in the course of such harvesting.
 
 
 79
 16 U.S.C. § 1537 note.
 
 
 80
 The Court of International Trade held that section 609 prohibits the importation into the United States of shrimp from countries that do not require their shrimp trawls to protect sea turtles to at least the same extent as is required of United States shrimp vessels. The State Department's 1991 guidelines initially interpreted the statute in accordance with this meaning and in compliance with section 609(b), but limited enforcement and potential certification to fourteen Caribbean countries. However, various environmental groups were concerned at the State Department's limitation to Caribbean countries, and in 1994 the plaintiffs sued for broader enforcement of section 609. In 1995 the Court of International Trade held that the statute was not limited to the Caribbean area. Earth Island Inst. v. Christopher, 913 F.Supp. 559 (Ct. Int'l Trade 1995). Eleven Caribbean countries had been certified at the time of this ruling.
 
 
 81
 In 1996 the State Department changed its interpretation of section 609, apparently in response to trade-related objections. The Department issued new Guidelines, and no longer required that all of a nation's shrimp trawlers meet standards at least as rigorous as those imposed on shrimpers in United States waters. The 1996 Guidelines instead adopted shipment-by-shipment certification, which required only that the particular shrimp imported into the United States were harvested by a ship fitted with turtle exclusion devices (TEDs). Such shrimp could be imported, whether or not any other ship in the nation's shrimp fleet used turtle-protective devices. During this period four countries in Central America received full certification, as well as nations that harvest only cold water shrimp (beyond the range of sea turtles), and nations that use aquaculture or hand (artisanal) shrimp fishing methods.
 
 
 82
 In response to the 1996 Guidelines, the plaintiffs who had prevailed in 1995 filed a "motion to enforce" the Court of International Trade's judgment, challenging the shipment-by-shipment approach as contrary to section 609. The Court of International Trade agreed with the plaintiffs and enjoined the government from importing any shrimp or products from shrimp harvested in the wild by vessels of uncertified nations. Earth Island Inst. v. Christopher, 942 F.Supp. 597 (Ct. Int'l Trade 1996). International pressures increased at this time, including complaints that this interpretation of section 609 was in violation of the General Agreement on Tariffs and Trade (GATT). In 1998 this court reversed the injunction, finding that the Court of International Trade lacked jurisdiction to rule on the motion to enforce because the plaintiffs had withdrawn the motion. Earth Island Inst. v. Albright, 147 F.3d 1352, 1356 (Fed.Cir.1998). Following this court's decision, the State Department issued the 1998 Guidelines, reinstating the shipment-by-shipment approach; these are the guidelines at issue in this case.
 
 
 83
 The Court of International Trade in April 1999 again held that the State Department's interpretation of section 609 was incorrect. The court held that section 609(b)(2) limits section 609(b)(1) to shrimp from countries that meet the certification requirements of section 609(b)(2). The court explained that the statute requires country certification, not shipment-by-shipment certification as to the particular load of shrimp:
 
 
 84
 [P]aragraph (1) of section 609(b) is specifically contingent upon the certification procedure established by section 609(b)(2), which offers the only congressionally-approved breaches of the embargo....
 
 
 85
 Earth Island Inst. v. Daley, 48 F.Supp.2d 1064, 1081 (Ct. Int'l Trade 1999). The court further reasoned that:
 
 
 86
 Paragraphs (b)(1) and (b)(2) are pari materia; they cannot be read independently, or out of the context adopted by Congress, including section 609(a) [instructing negotiations to protect sea turtles worldwide], to slow or stanch the extinction of species of sea turtles.
 
 
 87
 
 Id.
 
 
 
 88
 The issue is whether, contrary to this decision of the Court of International Trade, the State Department correctly interpreted section 609 as requiring no more than that the particular shipment to the United States was harvested using a TED. My colleagues on this panel so hold. However, neither the statutory text, its legislative purpose, its enactment history, nor its contemporaneous interpretation, supports this meaning.
 
 
 The Legislative Purpose
 
 
 89
 It is not disputed that sea turtles are endangered by commercial trawl shrimping.[2] The decline in sea turtle populations throughout the world has been dramatic; for example, as of 1990 the Kemp's ridley turtle population had declined to less than one percent of its abundance in 1947. See Decline of the Sea Turtles: Causes and Prevention, 26 National Academy of Sciences 144 (1990). The acknowledged principal cause of sea turtle deaths is capture and drowning in shrimp trawl nets. In 1987 the National Marine Fisheries Service estimated that 11,179 sea turtles were killed in southeastern United States waters each year. United States trawlers harvest eight percent of the world's supply of shrimp. Sea turtles, however, roam in warm waters worldwide, and are endangered worldwide. Globally, it was estimated that 124,000 turtles were killed each year by commercial shrimp trawlers. See Earth Island, 913 F.Supp. at 568.
 
 
 90
 On this background, section 609 was enacted. The statute requires nations that wish to serve the United States market to adopt turtle-protective measures no less rigorous than those imposed on our own fleet; all trawl shrimpers in United States waters are required to use turtle exclusion devices. It is generally accepted that when some trawlers use turtle exclusion devices and others do not, the turtles escaped or excluded from the nets of one trawler are often caught by trawlers without TEDs. However, if all vessels in harvest areas use turtle exclusion devices, it is estimated that the devices release "97 percent of the turtles caught in shrimp trawls." Sea Turtle Conservation; Shrimp Trawling Requirements, 52 Fed. Reg. 24244, 24244 (June 29, 1987). These data led to the legislation as enacted, requiring that other countries, if their shrimpers wish to sell into the United States market, protect the turtles to the same extent as required for United States vessels. At the time of enactment it was well recognized that the purpose of the legislation was to protect sea turtles in their global habitat, while assuring that United States fishermen were not competitively disadvantaged. Both goals are served by the statute's requirement that nations whose shrimp fishers wish to sell to the United States must adopt fleet-wide turtle-protection devices, and not simply place such devices on selected ships. The Report of the Senate Committee on Appropriations explained the legislation as follows:
 
 
 91
 It calls for a ban on imports of shrimp from any nation that: (1) fails to adopt a regulatory program for turtle protection which is comparable to that of the United States; and (2) has higher incidental catches of sea turtles than U.S. shrimpers.
 
 
 92
 S.Rep. No. 101-144, at 104 (1989). Similarly, after the Conference addition of section 609(b)(2)(C) providing that certification may be based on turtle-free shrimp fishing environments, the Conference Report of the House of Representatives explained the legislation as requiring
 
 
 93
 a ban on importation of shrimp which have been harvested with commercial fishing technology which may adversely affect species of sea turtles subject to the regulations, not later than May 1, 1991, unless the President certifies to Congress that the harvesting nation has adopted regulations governing the incidental taking of sea turtles in the course of shrimp harvesting comparable to regulations adopted by the U.S., that the average rate of the incidental taking by the vessels of the harvesting nation is comparable to the average rate of incidental taking of sea turtles by U.S. vessels in the course of such harvesting or the particular fishing environment of the harvesting nation does not pose a threat of the incidental taking of sea turtles in the course of such harvesting.
 
 
 94
 H.R. Conf. Rep. No. 101-299, at 84 (1989) (emphasis added). Neither of the legislative Reports indicates that Congress intended to adopt or accept merely a shipment-by-shipment approach to importation of shrimp.
 
 
 95
 The legislative record illustrates the congressional purpose of protecting these endangered animals worldwide, while avoiding any disadvantage to domestic shrimp fishing interests due to their obligatory use of TEDs.[3] The sponsor of section 609, Senator Breaux, explained:
 
 
 96
 [T]he amendment I am offering today is intended to promote the international conservation of sea turtles, and to provide the groundwork for ensuring that foreign fishing interests bear as great a conservation burden as our own industry.
 
 
 97
 135 Cong. Rec. S8335, 8373-74 (daily ed. July 20, 1989). Senator Breaux further stated:
 
 
 98
 [T]his amendment focuses on the role that other nations must play if we are to fulfill our goal of effective sea turtle conservation.
 
 
 99
 Id. at 8374. Senator Chafee also explained that the legislation
 
 
 100
 serves to strengthen our Nation's commitment to protect endangered sea turtles from drowning in commercial shrimp nets.
 
 
 101
 Id at 8375. Senator Johnston also recognized that the legislation would create
 
 
 102
 an effective protection first for sea turtles, and alternatively help for the price of shrimp for our shrimpers in Louisiana.
 
 
 103
 135 Cong. Rec. S12191, 12266 (daily ed. Sept. 29, 1989). Senator Johnston explained the commercial benefits as follows:
 
 
 104
 What it will mean in practical terms, we think, if those countries do not take that action [to place TEDs on all vessels] the price of shrimp obviously will go up because the supply will be down, so that Louisiana shrimpers, Texas shrimpers, Florida shrimpers will in effect have some form of compensation in the form of higher prices for their shrimp should these countries fail to take that action.
 
 
 105
 Id. Senator Lott reiterated the idea that the legislation would
 
 
 106
 make sure that the other countries are taking the same measures we are. We cannot have a situation where we impose requirements on our shrimpers that other countries do not have and then allow them to use the opportunity to export a flood of shrimp into our country to fill a void that may be left.
 
 
 107
 135 Cong. Rec. S8335, 8374. Senator Shelby described the conservation programs of other nations as a condition of access to the United States market:
 
 
 108
 If other countries are to share in the benefits of access to the $20 million U.S. market, I believe that these countries should be required to implement conservation programs comparable to that of the United States.
 
 
 109
 Id. at 8376.
 
 
 110
 There were no statements, during the extensive floor discussion, contrary to the uniform goal of protecting endangered sea turtles and avoiding disadvantage to United States shrimpers. A shipment-by-shipment approach not only weakens the incentive for countries to impose TED requirements, but it removes the anticipated "level playing field" for domestic interests, for all United States shrimpers are required to use TEDs. That the legislation was designed for country-by-country certification, not shipment-by-shipment, was reiterated by Senator Breaux:
 
 
 111
 It is patently unfair on its face to say to the U.S. industry that you must abide by these sets of rules and regulations, but other countries do not have to do anything, and, yet, we will then give them our market. That is exactly what is happening. I think the amendment ... is a good amendment. It will require other countries to do exactly what we are being required to do, and if in fact they do not, they will lose the U.S. market.
 
 
 112
 135 Cong. Rec. S12191, 12266. Senator Hollings made a similar statement in describing the legislation:
 
 
 113
 It calls for a ban on imports of shrimp from any nation that: First, fails to adopt a regulatory program for turtle protection which is comparable to that of the United States, and second, has higher incidental catches of sea turtles than U.S. shrimpers.
 
 
 114
 Id. at 12207.
 
 
 115
 Senator Hollings, after the Conference with the House, explained the addition of section 609(b)(2)(C), that a country will be certified and its shrimp imports permitted when the "particular fishing environment of the harvesting nation does not pose a threat of the incidental taking of such sea turtles in the course of such harvesting." 135 Cong. Rec. S14389, 14391 (daily ed. Oct. 31, 1989). This amendment clarified that the ban on importation does not apply when a nation's shrimp are grown in aquaculture, or caught by hand line (artisanal) fishing, or by trawling in cold water that is not turtle habitat. This clause did not, however, authorize or accept the use of trawl methods that do not exclude the turtles. There is no support at all for the government's theory that section 609(b)(2)(C) adjusted the legislative purpose and permitted use of shrimp fishing technology that "may affect adversely such species of sea turtles" as long as the turtle-destroying shrimp catch is not sent to the United States market.[4]
 
 
 116
 Since United States shrimpers produce only eight percent of the world's shrimp catch, sea turtle protection was recognized as requiring a global effort. Although the panel majority's theory that "section 609 was not enacted with the primary goal of minimizing sea turtle deaths" is not supported by the legislative record, the alternative legislative goal of protecting the domestic industry is also disserved by permitting importation from nations whose other vessels do not carry turtle-exclusion devices. In addition, I do not agree with the majority that if there is a commercial aspect to legislation, the humanitarian purpose becomes irrelevant.
 
 
 The Guidelines
 
 
 117
 For the first six years after enactment, the State Department interpreted section 609 as requiring an embargo of all shrimp from a nation that harvests shrimp in turtle habitat with at least some trawlers that do not use turtle exclusion devices. This interpretation was changed in the 1996 Guidelines. "An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is `entitled to considerably less deference' than a consistently held agency view." I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (quoting Watt v. Alaska, 451 U.S. 259, 273, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981)).
 
 
 118
 It cannot be disputed that when only some of the ships trawling for shrimp use TEDs, sea turtles that are saved by the TEDs may later be captured by the vessels without TEDs. The Commerce Department itself raised this concern. Rolland Schmitten, Fisheries Administrator for the National Marine Fisheries Service, wrote as follows:
 
 
 119
 By requiring that TEDs be used only on those vessels that harvest shrimp for export to the U.S. market, sea turtles will be put at greater risk of incidental capture aboard non-TED equipped boats in a nation's fleet.
 
 
 120
 This approach will also reduce the incentive for nations to adopt comprehensive national programs to reduce the incidental take of sea turtles ... [and] may also result in some certified nations abandoning the comprehensive programs they now have in place or curtailing enforcement of such programs.
 
 
 121
 Letter from R. Schmitten to Mary Beth West, Deputy Assistant Secretary of State for Oceans (July 28, 1998).
 
 
 122
 Although the government argues that the State Department has discretion to interpret the statute, citing Japan Whaling Association v. American Cetacean Society, 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986), in that case the Court held that the discretion exercised by the Secretary of Commerce for phased-in compliance with the national whale quota was "a reasonable construction of the language used in [the legislation]." Id. at 232, 106 S.Ct. 2860. Here, the State Department's interpretation is not a reasonable construction of the statute, which clearly requires country-by-country, not shipment-by-shipment, certification. An agency's statutory interpretation cannot stand if it contravenes the clearly expressed legislative intent. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."); Board of Governors of Fed. Reserve Sys. v. Dimension Financial Corp., 474 U.S. 361, 368, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986).
 
 
 123
 In its brief, the Secretary of State suggests that matters of international relations and trade pressures in the World Trade Organization (WTO) have warranted more circumspect handling than section 609 may have originally contemplated. The government also states that global turtle protection is proceeding, albeit slowly. However, this court is not authorized to evaluate a pragmatic political accommodation. We, like the Executive branch, are bound by the law as Congress enacted it.
 
 
 The World Trade Organization Litigation
 
 
 124
 The government makes much of the recent resolution of the challenge to section 609 in the WTO. In 1996 Malaysia, Thailand, India, and Pakistan challenged the United States' implementation of section 609 as contrary to the GATT. The WTO Appellate Body held that this statute was within an exception to GATT rules in that it related to conservation, but held that various aspects of the certification guidelines were discriminatory. Eventually, in 2001, on a second suit brought by Malaysia, the State Department's 1999 Guidelines (which authorize shipment-by-shipment certification) were accepted as in harmony with the GATT.
 
 
 125
 The government states that the WTO rulings "support" the State Department's interpretation. The government describes these WTO rulings as "the law of nations" and states that "an act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains," quoting Murray v. The Charming Betsy, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804). However, no party asserts that WTO decisions have controlling status as United States law. The Statement of Administrative Action (SAA) accompanying the Uruguay Round Agreement Acts states that decisions of WTO panels and the WTO Appellate Body "have no binding effect under the law of the United States and do not represent an expression of U.S. foreign or trade policy." H.R. Doc. No. 103-316, at 1032 (1994). The SAA also states:
 
 
 126
 If a[WTO] report recommends that the United States change federal law to bring it into conformity with a Uruguay Round Agreement [including the GATT], it is for the Congress to decide whether any such change will be made.
 
 
 127
 Id. The SAA is "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d); see also 19 U.S.C. § 3512(a)(1) ("No provision of any of the Uruguay Round Agreements, nor the application of any such provision to any person or circumstance, that is inconsistent with any law of the United States shall have effect.").
 
 
 128
 Thus although the government appears to rely on the WTO ruling as requiring United States (and judicial) support of the current Guidelines, neither we nor the State Department has authority to rewrite the statute. See Suramerica de Aleaciones Laminadas C.A. v. United States, 966 F.2d 660, 668 (Fed.Cir.1992) ("if the statutory provisions at issue here are inconsistent with the GATT, it is a matter for Congress and not this court to decide and remedy"); Mississippi Poultry Ass'n, Inc. v. Madigan, 992 F.2d 1359, 1366 (5th Cir.1993) (the court must "give effect to Congress' intent, even if implementation of that intent is virtually certain to create a violation of the GATT").
 
 
 129
 I repeat, it is not before us to decide whether the State Department has pursued a path that is diplomatically preferable to that selected by the Congress. The government brief states that an increasing number of nations are requiring the use of TEDs for all their trawled shrimp. These salutary developments do not relieve the judicial obligation to implement the statutory text as Congress intended and enacted it. Thus I must, respectfully, dissent from the court's incorrect statutory interpretation.
 
 
 
 Notes:
 
 
 [1]
 Revised Notice of Guidelines for Determining Comparability of Foreign Programs for the Protection of Sea Turtles in Shrimp Trawl Fishing Operations, 63 Fed.Reg. 46094 (Aug. 28, 1998). The plaintiffs challenged the 1998 Guidelines, now superseded by the 1999 Guidelines, which do not differ as to the point here at issue. Revised Guidelines for the Implementation of Section 609 of Public Law 101-162 Relating to the Protection of Sea Turtles in Shrimp Trawl Fishing Operations, 64 Fed.Reg. 36946 (July 8, 1999).
 
 
 [2]
 Five sea turtle species are listed as endangered or threatened: the loggerhead (Caretta caretta), Kemp's ridley (Lepidochelys kempi), green (Chelonia mydas), leatherback (Dermochelys coriacea), and hawksbill (Eretmochelys imbricata).
 
 
 [3]
 At the time of enactment the concern was not the cost of a TED, which was as low as $200, but the possible reduction of the catch. The record states that experience has shown no significant reduction in catch, and indeed some ancillary advantages such as exclusion of debris and unwanted fish
 
 
 [4]
 The panel majority states that it cannot see any difference between aquacultured or hand-caught shrimp and TED-caught shrimp. Aquacultured shrimp are farmed rather than caught in the open seas, with no risk to sea turtles. And hand caught shrimp do not pose a serious threat to sea turtles because of the short duration of tow timesSee Revised Guidelines for Determining Comparability of Foreign Programs for the Protection of Turtles in Shrimp Trawl Fishing Operations, 58 Fed. Reg. 9015, 9016 (Feb. 18, 1993). By contrast, mechanized commercial shrimp trawling constitutes a considerable threat to sea turtles, a threat that is not relieved when only some of the trawlers use TEDs.