299 F.3d 1373
 TURTLE ISLAND RESTORATION NETWORK, Todd Steiner, The American Society for the Prevention of Cruelty to Animals, The Humane Society of the United States, and the Sierra Club, Plaintiffs-Appellants,
v.
Donald L. EVANS, Secretary of Commerce, Colin L. Powell, Secretary of State, Paul H. O'Neill, Secretary of the Treasury, David B. Sandlaw, Assistant Secretary of State for the Bureau of Oceans and International Environmental and Scientific Affairs, Penelope D. Dalton, Assistant Administrator for Fisheries, National Marine Fisheries Service, and Alan P. Larson, Under Secretary of State for Economic Business and Agricultural Affairs, Defendants-Cross Appellants, and
National Fisheries Institute, Inc., Defendant-Cross Appellant.
 No. 00-1569.
 No. 00-1581.
 No. 00-1582.
 United States Court of Appeals, Federal Circuit.
 DECIDED August 8, 2002.
 
 1
 Appealed from United States Court of International Trade; Judge Thomas J. Aquilino, Jr.
 
 
 2
 Joshua R. Floum, Legal Strategies Group, of Emeryville, CA, filed a petition for panel rehearing and rehearing en banc for plaintiff-appellant. With him on the petition was Ariela F. St. Pierre.
 
 
 3
 M. Alice Thurston, Attorney, Environment and Natural Resources Division, Civil Division, Department of Justice, of Washington, DC, filed a response for the defendants-cross appellants. With her on the response were David M. Cohen, Director; and Lucius B. Lau, Assistant Director, Commercial Litigation Branch, Civil Division; and Jean E. Williams, and Ellen Durkee, Attorneys, Environment and Natural Resources Division; and Violanda Botet, Attorney, Department of State; and Pamela B. Lawrence, Attorney, Department of Commerce.
 
 
 4
 Eldon V.C. Greenberg, Garvey, Schubert & Barer, of Washington, DC, filed a response for the defendant-cross appellant.
 
 
 5
 Monica P. Medina, Heller, Ehrman, White & McAuliffe, L.L.P., of Washington, DC, filed an amicus curiae brief for the Georgia Shrimp Association and Boone Seafood. With her on the brief was Danielle K. Stinemetz.
 
 
 6
 Paul P. Spaulding, III, Farella Braun & Martell LLP, of San Francisco, CA, filed an amicus curiae brief for Dr. Frank V. Paladino, et al. With him on the brief was Ladd Cahoon.
 
 
 7
 ON PETITION FOR PANEL REHEARING AND REHEARING EN BANC
 
 
 ORDER
 
 
 8
 A combined petition for panel rehearing and rehearing en banc was filed by the plaintiffs-appellants, and responses thereto were invited by the court and filed by the defendants-cross appellants.[1] Amicus Curiae briefs were filed by the Georgia Shrimp Association and Boone Seafood, and Dr. Frank V. Paladino, et al. This matter was referred first to the merits panel that heard this appeal.
 
 
 9
 Thereafter, the petition for rehearing en banc was referred to the circuit judges who are in regular service and authorized to request a poll. A poll was requested, taken, and failed.
 
 
 10
 Upon consideration thereof,
 
 IT IS ORDERED THAT:
 
 11
 (1) The petition for rehearing is denied.
 
 
 12
 (2) The petition for rehearing en banc is denied.
 
 
 13
 GAJARSA, Circuit Judge, with whom NEWMAN, Circuit Judge, joins, dissents from the denial of the petition for rehearing en banc.
 
 
 14
 GAJARSA, Circuit Judge, with whom NEWMAN, Circuit Judge, joins, dissenting from the denial of the petition for rehearing en banc.
 
 
 15
 For the reasons stated herein, we respectfully dissent from the court's denial of the petition to rehear this case en banc. In Turtle Island Restoration Network v. Evans, 284 F.3d 1282 (Fed.Cir.2002) ("Turtle Island"), a divided panel of this court held that The Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1990, Pub. L. 101-162, Title VI, § 609, 103 Stat. 1037 (1989) (codified at 16 U.S.C. § 1537 note (2000)) ("section 609"), permits the importation of shipments of shrimp that the statute plainly prohibits. The panel majority reached this conclusion by adopting an unreasonable statutory interpretation. This unreasonable interpretation was first reflected in State Department Guidelines interpreting section 609 in 1996. Turtle Island, 284 F.3d at 1302 (Newman, J., dissenting). In the preceding six years, however, the State Department had a conflicting interpretation of the statute. In Turtle Island, the panel majority adopted the State Department's most recent, unreasonable interpretation of the scope of the embargo codified in section 609. In so doing, the decision also contravened clear and well-established Supreme Court precedent directing that the judiciary "must reject administrative constructions which are contrary to clear congressional intent," I.N.S. v. Cardoza Fonseca, 480 U.S. 421, 447-48, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (quoting Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc., 467 U.S. 837, 843, n. 9, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)), and that "[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is `entitled to considerably less deference' than a consistently held agency view," id. at 446 n. 30, 107 S.Ct. 1207 (quoting Watt v. Alaska, 451 U.S. 259, 273, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981)). Accordingly, this court should have granted the petition for rehearing en banc.
 
 
 16
 Sea turtles, several species of which are endangered, frequently inhabit the same waters as shrimp. Turtle Island, 284 F.3d at 1286. When mechanized shrimping vessels trawl for shrimp, their nets also catch sea turtles. Id. at 1284. Sea turtles must breathe air after 90 minutes of submersion, and trawl nets are typically deployed for longer than 90 minutes. Id. Thus, shrimping with mechanized commercial trawlers drowns sea turtles. Id. Since 1987 the United States has required shrimp trawlers operating in U.S. waters where sea turtles are found to install turtle excluder devices ("TEDs"). Id.
 
 
 17
 Section 609 applies to countries that seek to import shrimp to the United States. Section 609 bans the importation of certain shrimp unless the harvesting nation obtains certification either by: 1) adopting regulatory measures comparable to those applicable in the United States and obtaining a comparable average rate of incidental taking of sea turtles; or 2) harvesting in a fishing environment that poses no threat to sea turtles (e.g., because no endangered turtles inhabit it). The panel majority misinterpreted the scope of the initial ban to which these exceptions apply. With the misinterpreted portion emphasized, the pertinent part of section 609 reads as follows:
 
 
 18
 (b)(1) In General — The importation of shrimp or products from shrimp which have been harvested with commercial fishing technology which may affect adversely [certain] species of sea turtles shall be prohibited not later than May 1, 1991, except as provided in paragraph (2).
 
 
 19
 The panel majority began its statutory interpretation by noting that the statutory language imposes an embargo on shrimp harvested in a certain manner, and that the embargo is inapplicable to shrimp that have not "been harvested with commercial fishing technology which may affect adversely" sea turtles. Turtle Island, 284 F.3d at 1291-92. The majority made a fatal error, however, in concluding that 609(b)(1) does not ban the importation of shrimp from uncertified countries if the particular shipment in question has been harvested with TED-equipped trawlers. The majority determined that:
 
 
 20
 Because TED-caught shrimp have not been harvested with commercial fishing technology that may harm sea turtles, the statutory language does not support embargoing TED-caught shrimp from uncertified countries.
 
 
 21
 Id. at 1292.
 
 
 22
 But TED-caught shrimp have been harvested with commercial fishing technology that may harm sea turtles. Unlike acquacultured shrimp, or hand-caught shrimp, mechanized commercial shrimping vessels drown some sea turtles even when those vessels are installed with TEDs. The government does not dispute that TEDs are at best 97% effective. Moreover, as Judge Newman explained, "mechanized commercial shrimp trawling constitutes a considerable threat to sea turtles, a threat that is not relieved when only some of the trawlers use TEDs." Turtle Island, at 1302 n. 4 (Newman, J., dissenting). Thus, mechanized commercial shrimp trawling is "commercial fishing technology that may harm sea turtles." This is so even if a particular trawler is installed with TEDs, and is particularly true where only part of a fleet has been installed with TEDs.
 
 
 23
 Section 609(b)(1) plainly bans the importation of shrimp harvested with mechanized trawlers unless, pursuant to section 609(b)(2), the harvesting nation obtains certification of its regulatory program (by equipping its entire fleet with TEDs) or harvests in waters uninhabited by endangered sea turtles. Thus, in addition to the text of section 609(b)(1), the statutory structure demands this interpretation; it is incongruous to interpret the scope of the embargo as narrower than its exceptions.
 
 
 24
 The panel majority's interpretation renders the certification exception a nullity. Certain shrimp-exporting countries that harvest in waters inhabited by endangered sea turtles have continued to obtain certification; however, they have done so under a condition of uncertainty as to the requirements of U.S. law, which provides a continuing incentive to maintain certification. We will not see the effect of the panel's decision on the incentives for certification and, ultimately, on the survival of sea turtles until this litigation has ended. Thereafter there will be no need for country certification, and the slaughter of the turtles can resume.
 
 
 25
 The panel majority's opinion flouts another of the traditional indicia of Congressional intent: legislative history. As Judge Newman's dissent explains, Congress sought to pursue two goals by enacting section 609. First, Congress intended to protect sea turtles globally. Turtle Island, 284 F.3d at 1300 (Newman, J., dissenting). Second, Congress intended to assure that the domestic shrimp industry was protected from competition with shrimpers from nations with less stringent (and therefore less costly) regulations that did not require fleet-wide TED installation. Id.
 
 
 26
 The panel majority is unfaithful to both aspects of the legislative history. After stating that it was "unmistakably clear" that "the primary purpose of the bill was to protect the domestic shrimping industry, and not the sea turtle," id. at 1294, the majority concluded that section 609 does not ban particular shipments from uncertified countries of shrimp caught by vessels installed with TEDs, id. at 1295. According to the panel majority, TED installation "on vessels not serving the United States market" would not advance Congress's aim of "achieving parity for the domestic shrimp industry," because Congress was not concerned with placing domestic shrimpers on equal footing with foreign shrimpers in foreign markets. Id. But, of course, foreign shrimpers who are required to bear the cost of installing TEDs only on those ships serving the United States market also receive a competitive advantage in that market. By equipping only part of their fleet with TEDs, foreign shrimpers can lower the price charged to the United States market. By contrast, the domestic shrimp industry must have TEDs on all of their boats, and the cost of fleet-wide TED installation is reflected in the price they must charge shrimp consumers. The panel majority's interpretation therefore fails to comport with what it called the bill's "primary purpose," because it fails to protect domestic shrimpers from competition with foreign shrimpers who are subject to less rigorous, less costly regulations.[2]
 
 
 27
 Moreover, the panel majority's interpretation completely ignores the Congressional goal of protecting endangered sea turtles. To echo Judge Newman: "I do not agree with the majority that if there is a commercial aspect to legislation, the humanitarian purpose becomes irrelevant." Id. at 1302 (Newman, J., dissenting). The statute states that nations whose shrimpers want to sell shrimp in the United States must protect the turtles. This is a benevolent use of our market power; it hurts no one and rescues the turtles. It was entirely improper for the panel majority to interpret the statute inconsistently with this legislative purpose.
 
 
 28
 The majority's interpretation of section 609 contravenes the text of the ban embodied in section 609(b)(1), renders the certification exception embodied in section 609(b)(2) a nullity, and ignores the dual goals reflected in the legislative history. It contravenes every indicia of Congressional intent. As Senator Lott explained, section 609 was intended to "make sure that the other countries are taking the same measures we are." 135 Cong. Rec. 15,509 (1989).
 
 
 29
 Moreover, although the panel majority purported to afford no deference to the State Department's interpretation of section 609, it effectively deferred. The opinion stated:
 
 
 30
 While Congress may have intended the administering agency to define which methods of harvesting shrimp may adversely affect sea turtles, we find no intent to delegate the power to define the scope of the embargo itself.
 
 
 31
 Turtle Island, 284 F.3d at 1293. But section 609(b)(1) defines the scope of the embargo with respect to whether shrimp have been "harvested with commercial fishing technology which may affect adversely" endangered sea turtles. By summarily adopting the State Department's position that only some of the nation's fleet need be equipped with TEDs and that the legislation requires no more, the panel majority deferred to the State Department's unreasonable statutory construction. From 1991 to 1996, the State Department interpreted the embargo to apply to all shipments of shrimp from certain uncertified countries; thus, they adopted a nation-by-nation, not a shipment-by-shipment construction of the statute. In 1996, in response to pressure from some countries through the WTO, the State Department revised its Guidelines to require only shipment-by-shipment certification. As explained above, this interpretation of the statute is unreasonable. It is therefore entitled to no deference, particularly in light of the State Department's earlier, contrary interpretation.
 
 
 32
 The panel majority interpreted section 609 in a manner that violates axiomatic law regarding statutory interpretation. Mechanized commercial shrimp vessels are "commercial fishing technology which may affect adversely" endangered sea turtles. Congress clearly intended to ban the importation of shrimp harvested with mechanized shrimping vessels subject only to the nation-by-nation exceptions codified in section 609(b)(2). Thus, the legislation permits the importation of shrimp from only those countries that require the same restrictions we impose on our own fishing fleets. Those requirements apply irrespective of where the shrimp are ultimately sold.
 
 
 33
 The text of section 609(b)(1), the structure of the statute in light of the nation-by-nation exemptions embodied in section 609(b)(2), and the legislative history unequivocally require this interpretation. Neither the panel majority nor the State Department may properly disregard Congressional intent. The panel majority unreasonably construed a statute that was written to protect turtles so as not to protect them. This court should have granted the petition for rehearing en banc in order to construe the statute consistently with Congressional intent. We therefore respectfully dissent from the denial of the petition for rehearing en banc.
 
 
 
 Notes:
 
 
 [1]
 The governmental parties, and the National Fisheries Institute, Inc. each filed responses
 
 
 [2]
 The Georgia Shrimp Association and Boone Seafood, amici representing the domestic shrimp industry, explain that the shipment-by-shipment approach adopted by the panel majority puts "the domestic shrimpers at a huge competitive disadvantage." They state that the availability of cheap imported shrimp has already led to a situation where "large distributors and wholesalers now bypass domestic shrimpers such as Boone in order to double and triple their profits," and that this situation will worsen as countries opt out of certification and lower their fleet-wide costs